400 So.2d 956 (1981)
Dennis Wayne SMITH, Appellant,
v.
STATE of Florida, Appellee.
Nos. 60660, 60661.
Supreme Court of Florida.
June 25, 1981.
*958 David Paul Montgomery of Staab & Montgomery, Bradenton, and B.J. Owens, Sarasota, for appellant.
Jim Smith, Atty. Gen., and Michael A. Palecki, Asst. Atty. Gen., Tampa, for appellee.
ALDERMAN, Justice.
Dennis Wayne Smith appeals the trial court's denial of his motion to vacate judgment and sentence. Included in Smith's motion were allegations that he received ineffective assistance of counsel upon direct appeal and that he was denied due process when this Court considered a psychological report not disclosed to him. We treat these allegations as a petition for writ of habeas corpus. He also seeks leave to apply for a writ of error coram nobis on the basis of alleged newly discovered evidence. With the exception of an alleged violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we affirm the trial court's denial of post-conviction relief, we deny habeas corpus, and we deny leave to apply for a writ of error coram nobis. We remand to the trial court for it to consider the alleged Brady violation.
Smith's conviction of first-degree murder and his sentence of death were affirmed by this Court, Smith v. State, 365 So.2d 704 (Fla. 1978), and the Supreme Court of the United States denied his petition for writ of certiorari. Smith v. Florida, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). On May 5, 1981, the Florida Cabinet denied his request for clemency, and he was scheduled to be executed on June 3, 1981. On May 21, 1981, Smith filed a motion to vacate, set aside, or correct his judgment and sentence.
As a basis for relief, he alleged that there was newly discovered evidence in the form of a recantation after trial by Wesley Johnson, the chief prosecution witness, and in the form of an after-trial discovery by defense of an alleged Brady violation. He also alleged that he was denied a fair trial because the trial court allowed the State to submit evidence of the subsequent murder of James Wagner and to use coerced and unreliable testimony, because the prosecutor commented on Smith's post-arrest silence, because the trial court allowed Johnson's wife and Dr. Niswonger to testify over defense objection, because the trial court used an informal "Allen" charge, because the imposition of the death sentence was the result of unbridled prosecutorial discretion, and because there was a Witherspoon error in the selection of the jury. He further contended that he was denied a fair sentencing hearing because the State prejudiced him by offering hearsay evidence of his bad character, because he was denied his right to confront witnesses, because the State was permitted to introduce evidence which was not relevant to any statutorily *959 enumerated aggravating circumstances, and because the trial court restricted mitigating circumstances which the jury could consider. He additionally contended that he was denied due process by the Florida Supreme Court's consideration of a psychological report not disclosed to him and that he was not provided effective assistance of counsel at trial or on appeal.
The trial court concluded that the majority of Smith's claims were not appropriate to a Florida Criminal Procedure Rule 3.850 proceeding. Although it found that Smith's contentions relating to a Brady violation by the State were inappropriate to a proceeding under rule 3.850, it did consider and find to be without merit Smith's claim of newly discovered evidence in the form of Johnson's recantations after trial. It further held that Smith's claim of ineffective assistance of counsel and his claim of due process violation by this Court's alleged consideration of a psychological report were unsupported by any competent allegation of evidence and therefore failed to state a cause of action upon which relief could be granted. Finding insufficient basis upon which relief could be granted, the trial court denied this motion without an evidentiary hearing and denied Smith's motion for stay of execution.
After reviewing the motion, record, and briefs, and after oral argument, on May 28, 1981, we granted Smith's application for stay of execution pending disposition of this appeal.
In addition to his appeal from the denial of the rule 3.850 motion, Smith, recognizing that several issues raised below were inappropriate to a rule 3.850 proceeding, has filed a petition for leave to apply for writ of error coram nobis and has requested that we consider his claim of ineffective assistance of appellate counsel as a petition for writ of habeas corpus.
Initially, we hold that with the exception of the alleged Brady violation and the challenge of ineffective assistance of trial counsel, Smith's claims are inappropriate to a proceeding under rule 3.850. The remaining allegations, except his claims of ineffective assistance of appellate counsel and alleged improper consideration by us of a psychological report, were matters which were or could have been raised and disposed of on direct appeal and are not proper subject matters for a post-conviction motion. Hargrave v. State, 396 So.2d 1127 (Fla. 1981); Witt v. State, 387 So.2d 922 (Fla.), cert. denied, ___ U.S. ___, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). The trial court, therefore, properly refused to consider these allegations.
Ineffective assistance of trial counsel is a proper subject to be considered in a post-conviction 3.850 motion. In this case, however, applying the standards which we adopted in Knight v. State, 394 So.2d 997 (Fla. 1981), we hold that the trial court properly denied Smith's claim of ineffective assistance of trial counsel.
The issues of ineffective assistance of counsel on direct appeal and the purported consideration by this Court of a psychological report were matters not properly before the trial court and are matters which we will treat as a petition for writ of habeas corpus. The newly discovered evidence claims presented to the trial court have two separate and distinct aspects. One is a purported Brady violation by the State in not furnishing favorable evidence to Smith after a general request for such information had been filed, information Smith allegedly did not become aware of until after trial. The other purported newly discovered evidence consists of recantations made by the chief prosecution witness, Wesley Johnson, subsequent to trial. The former is a proper matter for a post-conviction motion, while the latter may only be considered by means of obtaining leave of this Court to file a petition for writ of error coram nobis. The trial court was, therefore, without jurisdiction to consider the latter claim since leave of this Court had not yet been sought by Smith, but it was with jurisdiction and should have considered the claim of a Brady violation. We will consider these claims of ineffective assistance of appellate counsel, alleged consideration of a psychological report, and the *960 two aspects of newly discovered evidence under the headings of the appropriate remedy under which relief should be sought.

Habeas Corpus
The claim of relief predicated on the assertion of ineffective assistance of appellate counsel can only be granted by habeas corpus in the appellate court. Knight v. State. We have considered Smith's assertions in light of the standards announced in Knight and find no substantial deficiency in Smith's representation on appeal by which he was prejudiced.
In his motion for post-conviction relief, Smith argued that he was denied due process because this Court, in connection with his appeal, allegedly considered material outside the record and not disclosed to him. Since a motion to vacate pursuant to Florida Rule of Criminal Procedure 3.850 must be directed to the judgment and sentence of the trial court, action of the Supreme Court of Florida may not be reviewed by this means. Foster v. State, 400 So.2d 1 (Fla. 1981). Treating this claim as a petition for writ of habeas corpus, we deny relief. We have previously resolved this issue against Smith in Brown v. Wainwright, 392 So.2d 1327 (Fla. 1981).

Petition for Leave to Apply for Writ of Error Coram Nobis
The alleged newly discovered evidence which Smith urged below as a basis for post-conviction relief included a series of after-trial recantations made by Johnson in the form of letters and affidavits. The appropriate first step for a defendant seeking a new trial on the basis of new evidence discovered after his conviction has been affirmed on appeal is a petition to the appellate court for leave to file a petition for error coram nobis. Without leave of the appellate court, the trial court has no jurisdiction to consider the coram nobis petition. Smith, recognizing his error in raising this point in his motion to vacate, has now filed a petition for leave to apply for a writ of error coram nobis. Since the trial court was without jurisdiction to consider this point on the merits, its finding that the unsupported recantation by Johnson was unreliable and did not serve as a sufficient basis upon which to grant relief was premature.
In considering whether to grant Smith's petition for leave to file a petition for error coram nobis, we must determine the legal effect of the alleged facts upon the previously entered judgment. In Hallman v. State, 371 So.2d 482 (Fla. 1979), we set out the specific requisites of a petition for the writ addressed to the appellate court. The alleged facts relied upon must be fully disclosed since the appellate court must be afforded full opportunity to determine whether prima facie grounds are established. Furthermore, the evidence upon which the alleged facts can be proved and the source of the evidence must be asserted. The facts alleged must not have been known by the court, by the party, or by counsel, at the time of trial, and it must be made clear that defendant or his counsel could not have discovered them through the use of due diligence. In determining the sufficiency of the application, we apply a strict test of conclusiveness predicated on the need for judicial finality. To warrant the granting of relief, the petition must allege facts of such a vital nature that, had they been known to the trial court, they conclusively would have prevented entry of the judgment. Hallman v. State, 371 So.2d at 485.
The facts alleged in the present case are that on June 1, 1979, in a letter to Governor Graham, Wesley Johnson, the State's key witness, stated that Smith did not participate in the murders but rather was at his apartment "sleeping off a drunk." Attached to this letter was an affidavit of Johnson stating that he had lied and stating that Smith was not with him when he killed Wagner and Arnsdorff. On June 29, 1979, Johnson directed another affidavit to Governor Graham and stated that he had lied on the stand and that he had lied to avoid the death penalty. Rodney Malloy, a prison inmate, wrote a letter dated September 3, 1976, advising that *961 Johnson had told him that Smith was not involved in the murder. At a May 28, 1980, hearing on the commutation of Smith's death sentence, Johnson again recanted his testimony.
Although these particular recantations were not known to the court or to counsel at the time of trial, we cannot say that the facts upon which the petition is based were unknown. The gist of these recantations is that Johnson committed the murders and that Smith was not involved and that Johnson lied to avoid the death penalty. But evidence of Johnson's confession to the murders and his statements that Smith was not involved and that he implicated Smith to avoid the death penalty were before the court and the jury, albeit in different form than now presented by Smith.
On direct examination by the State, Johnson testified:
Q. Have you had any communication with Smith since you have been in jail?
A. Yeah.
Q. What has been the nature of that communication?
A. Wanting me to cut him free.
Q. What do you mean, "cut him free"?
A. For me to say I killed all the people, that he wasn't there and whatnot.
... .
Q. Did you do anything or say anything that would help to cut Smith loose?
A. Yeah, I wrote him a confession and sent it to him.
Q. How about anything else?
A. Talked to a few jailers, convinced them that I had done it.
The "confession" referred to in Johnson's testimony was admitted into evidence as a defense exhibit.
Johnson also made it perfectly clear what his deal with the State was. At one point during cross-examination by defense counsel of Johnson, the following occurred:
Q. What is your deal with the state?
A. 25 to life.
Q. How many crimes did you confess to?
... .
A. Three.
... .
Q. Were there any stipulations pertaining to that?
A. What do you mean, to the sentence?
Q. Yes.
A. That I testify.
Q. Testify to what?
A. To the murders.
Q. Did it have anything to do with the implication of the defendant here, Mr. Smith?
A. Yes.
Q. And that was part of the deal?
A. That I testify to the murders for the state, yeah.
Q. And have you been sentenced yet?
A. No, not that I know of.
Q. Is it your understanding that you will not be sentenced until after you give your testimony?
A. Right.
Q. Therefore your testimony is based upon your not going to the electric chair, is that right?
A. Well, I'm talking, uh, yeah, I suppose so.
Q. You are frightened of going to the electric chair, aren't you.
A. Scared to death.
... .
Q. So you are in a position now  let me see if I have got this straight  of having given testimony against Mr. Smith with the promise from the state that if you did so you, who admit that you were involved in crimes, will get a sentence of from 25 years to life?
... .
A. It's not 25 to life. It's a life sentence, whereas on first degree murder I have to do at least 25 years before I am eligible for parole is the type of life sentence I will be receiving. And if I don't get off then, between now and then, the next 25 years I plan on making parole.
Q. Was [sic] there additional promises that these sentences would be together instead of one after the other?

*962 A. Concurrently, yes.
Q. In other words, you would get a concurrent sentence, only one life sentence?
A. Yes sir.
Q. Any other witnesses other than you and Birdman and Smith?
A. Not that I know of, no.
Q. So there is just you now and Smith?
A. Right.
Q. That's the way it is, isn't it?
A. Right.
Q. And you got 25 years if you behaved yourself, and we don't know what Smith has got, is that right?
A. Right.
It further appears that Smith introduced the testimony of two jailers who stated that they overheard Johnson say on several occasions that he was the only one who had committed the killing. During closing argument, defense counsel vigorously challenged Johnson's credibility and properly directed the jury's attention to Johnson's pre-trial confession that it was he, not Smith, who had committed the crimes. Defense counsel also emphasized Johnson's deal with the State, arguing:
Let's talk a little bit about the man, Wesley Irvin Johnson... .
And let me tell you what he has done. He has entered a nolo contendere plea which means he has made a no contest plea  this is by his own testimony  with the Court for multiple murders and he has not yet, ladies and gentlemen, been sentenced. He has made what is known as a deal, but the deal hasn't been closed. What's the consideration for the contract he made? It's to testify against the defendant here. That's the way we are running this trial. Without Wesley Irvin Johnson we wouldn't be here. Without his testimony we wouldn't be here. There wouldn't be any trial. There wouldn't be sufficient evidence to have stayed in this courtroom without his testimony... .
... .
[W]e had two men come in and say they heard Wesley Johnson say he had committed all the crimes... . Do you remember admitting that he wrote that note? Don't forget that. Don't forget that. You have a man who was flipping a coin; half the time he is on one side, half the time he is on the other side... .
That note is very, very important that you do remember that note. It was admittedly signed by him, admittedly sent to the defendant, and received by him. The state had knowledge of it and we had knowledge of it. (Emphasis supplied.)
The facts now offered as newly discovered evidence in an attempt to gain a new trial are cumulative to the evidence introduced at trial. Both court and counsel were aware that, prior to trial, Johnson had confessed and said that Smith was not involved in the commission of Arnsdorff's murder. Viewing the entire record in light of Smith's present claim, we cannot say that, had these additional recantations been before the trial court, the judgment would have been precluded. Therefore, the petition for leave to apply for writ of error coram nobis is denied.

Alleged Brady Violations
Prior to trial, Smith filed a general motion for production of all evidence favorable to him. In his motion for post-conviction relief, Smith contended that the State's failure to disclose certain allegedly favorable evidence to him before trial amounted to a Brady violation in contravention of his right to due process of law. He further alleged that he did not become aware of this purportedly undisclosed evidence until after judgment and sentence had been entered and that this evidence would have been material to his trial. Since this challenge is based on the ground that the judgment was entered in violation of the due process clause of the constitution, since Smith alleges he did not have knowledge of the basis for this challenge prior to final judgment, and since it is within the peculiar province of the trial court to determine whether there was a Brady violation requiring a new trial, Smith's raising of this point *963 in a motion to vacate judgment was appropriate.
The allegedly favorable evidence, which he contends was not disclosed, consists of police reports containing statements by Johnson when he was initially arrested wherein he made no mention of Smith as a coperpetrator of the murder and where he admitted to having committed the murder and statements by Johnson's wife containing no references to Smith.[1]
Since the trial court believed that this point was inappropriate to a rule 3.850 proceeding, it did not pass on the merits of the question of whether there was a Brady violation which would require a new trial, and accordingly we remand this singular issue to the trial court to make this determination.
The Supreme Court of the United States, in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-1197 (emphasis supplied).
The test of materiality in a situation where a general request is made for favorable evidence was definitively explained by the Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court determined that where a general request for favorable evidence has been made, as in the present case, implicit in the requirement of materiality is the concern that the undisclosed evidence would have affected the outcome of the trial. Upon assertion of a Brady violation after trial, the trial court is required to determine whether a defendant was deprived of his right to due process by the nondisclosure since, unless the omission deprived him of a fair trial, there is no constitutional violation. That an item of undisclosed information possibly may have helped the defense, or possibly may have affected the outcome of the trial, does not establish materiality in the constitutional sense. 427 U.S. at 109, 96 S.Ct. at 2400. The Supreme Court, in deciding the content of the test of materiality, distinguished a case of undisclosed, favorable evidence in the possession of the State from newly discovered evidence to which no one had access before judgment and said:
On the one hand, the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the *964 defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice. [Footnote omitted.]
427 U.S. at 111, 96 S.Ct. at 2401. On the other hand, although finding that the strict test to be applied where newly discovered evidence is involved does not apply in determining materiality as contemplated by Brady, the Supreme Court also concluded that every nondisclosure could not consistently be treated as error and explained:
It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his "conviction is sure that the error did not influence the jury, or had but very slight effect." Kotteakos v. United States, 328 U.S. 750, 764 [66 S.Ct. 1239, 1248, 90 L.Ed. 1557]. Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.
427 U.S. at 111-12, 96 S.Ct. at 2401. Finding that the proper standard of materiality must reflect an overriding concern with the justice of the finding of guilt, the Court announced the following as the test for materiality:
Such a finding [of guilt] is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [Footnote omitted.]
427 U.S. at 112-13, 96 S.Ct. at 2402.
It is incumbent upon the trial court to determine whether a Brady violation sufficient to warrant a new trial occurred in this case. We therefore remand this cause to the trial court to consider this issue, guided by the test of materiality announced by the Supreme Court of the United States in United States v. Agurs.

Conclusion
Accordingly, we affirm the trial court's denial of post-conviction relief on all grounds alleged with the exception of Smith's claim of a Brady violation. We reverse the trial court's ruling that the alleged Brady violation issue was inappropriate to a proceeding under rule 3.850 and remand to the trial court to consider this issue.[2] We deny the petition for leave to apply for writ of error coram nobis, and we deny habeas corpus.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON, ENGLAND and McDONALD, JJ., concur.
ADKINS, J., dissents.
NOTES
[1] More specifically, Smith stated the State failed to disclose:

1. The Daytona Beach Police Report of the confessions of Johnson which contain no references to Smith or a third perpetrator. (Exhibit K). This statement is inconsistent with Johnson's "post-agreement" assertions that Smith was a third perpetrator and would have served as proper impeachment of Johnson's testimony at trial.
2. The tape and transcript of Johnson's second confession to the Daytona Beach Police Department from which it is now believed defense could have discovered that Johnson's confession limited implications to Johnson and Wagner. This tape was expressly noted in the police officer's report and transferred to the possession of the Polk County Sheriff's Office with Johnson. (Exhibit K pp. 4, 8).
3. The Daytona Beach Police report of the statement of Johnson's wife, which contains no references to Smith or to a third perpetrator (Exhibit K p. 8). This statement is inconsistent with Patricia Johnson's testimony at trial that Johnson had named Smith as a third perpetrator prior to Johnson's arrest, and would have served as proper impeachment of Patricia Johnson's testimony to that effect at trial.
4. The report of the Polk County Sheriff's deputy of contacts by the office with Johnson's wife and mother making efforts to enlist their aid in coercing Johnson to implicate Smith in exchange for guarantees of Johnson avoiding a death sentence. (See Exhibit E which would have disclosed Deputy Keeney as a rebuttal witness in response to Patricia Johnson's testimony at trial.)
5. The tape and transcript of the statement of Patricia Johnson which it is believed continues to fail to implicate Smith and would have served to impeach Patricia Johnson's testimony at trial. This tape is expressly noted in the deputy's report. (Exhibit E p. 5.)
[2] The stay of execution issued by this Court is dissolved.