### Dennis Wayne SMITH, Petitioner-Appellant,

v.

### Louie L. WAINWRIGHT, Secretary of Florida Department of Offender Rehabilitation, et al., Respondents-Appellees.

No. 83–3690.

United States Court of Appeals, Eleventh Circuit.

Aug. 23, 1984.

Rehearing and Rehearing En Banc Denied Oct. 31, 1984.

Sondra Goldenfarb, Patrick D. Doherty, Clearwater, Fla., for petitioner-appellant.

Theda James Davis, Asst. Atty. Gen., Tampa, Fla., for respondents-appellees.

Before RONEY and HILL, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Dennis Wayne Smith appeals to this court from the order of the district court denying his petition for a writ of habeas corpus. We affirm the district court's judgment in part; however, concluding that Smith should have received a hearing on some of his claims of constitutional error, we vacate in part and remand.

Smith was tried and convicted in a Florida court on one count of first degree murder in late March, 1976. After a sentencing hearing, the trial judge sentenced Smith to death. Smith appealed to the Florida Supreme Court, which affirmed his conviction in *Smith v. State*, 365 So.2d 704 (Fla.1978), *cert. denied*, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). In 1981, Smith filed a motion to vacate his conviction and sentence pursuant to Florida Rule of Criminal Procedure 3.850. The trial court denied this motion without a hearing, and Smith appealed. The Florida Supreme Court affirmed the trial court's order in part, but remanded for an evidentiary hearing concerning an alleged violation of the rule in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Smith v. State*, 400 So.2d 956 (Fla.1982). After holding a hearing, the trial court again denied Smith's motion, and the Florida Supreme Court affirmed in *Smith v. State*, 421 So.2d 146 (Fla.1982). On February 9, 1983, Smith filed his petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254.

The factual background of this case is relevant to several of the issues raised by Smith. The primary evidence at trial against Smith was the testimony of Wesley Johnson, which the Florida Supreme Court summarized as follows:

After taking part in the murder of John Mitchell Arnsdorff, Wesley Johnson turned himself into the police. Eventually he was charged with two other murders, as well. In the meantime he implicated Smith in the Arnsdorff murder and, accordingly, Smith was indicated for first degree murder. Smith pleaded not guilty and the cause was set for trial. Before its start, Johnson pleaded nolo contendere to the three murders and was to be given concurrent life sentences in return for testimony against Smith, the sentences to be imposed after the testimony.

Johnson testified to the following: He, Smith and a man named Wagner met at a bar and decided to rob a homosexual in order to obtain money for beer. The three then went to another bar where they met Arnsdorff. On the pretext of giving a party, they invited him to a shack Johnson was staying in. Arnsdorff and Johnson drove in Arnsdorff's car, Smith and Wagner in Smith's car. Johnson and Arnsdorff reached the shack first. Smith and Wagner had taken a wrong turn and were late, but Johnson kept Arnsdorff from leaving by showing him some silver casting equipment. When the former two arrived the men drank beer for a short while and then Johnson grabbed Arnsdorff while Wagner threatened him with an ice pick. While Arnsdorff was restrained Smith took Arnsdorff's wallet, in which there was $6.00, from his car and one of the three removed his wrist watch. They then forced Arnsdorff into the trunk of his own car. Their intention was to abandon him in a remote spot. Wagner and Johnson, in Arnsdorff's car, were following Smith in his car when they ran into a bridge abutment, flattening a tire. (Throughout the night the three had been drinking heavily.) After an unsuccessful attempt to fix it, the two cars proceeded until the wheel with the flat tire came loose. One of the three opened the trunk and Smith hit Arnsdorff with a tire tool. Wagner then began to stab him with the ice pick. Believing Arnsdorff to be dead they shut the trunk with him in it and went to a gas station. Smith told Wagner to get some gas, which he did. They returned to Arnsdorff's car and at Smith's direction, Johnson doused it with gas and set it afire. (Expert opinion that Arnsdorff died from incineration or asphyxiation from smoke caused by the fire had been introduced into evidence earlier.)

At this point in Johnson's narration the court excused the jury to allow the defense to renew a pre-trial motion that testimony by Johnson as to a second murder by him and Smith be suppressed. The court denied the motion, as it had previously done, on the ground that the second murder, though separate from the first, was part, just as Arnsdorff's, of a single transaction, the robbery, and, therefore, relevant to the Arnsdorff murder.

Johnson then testified that after burning the car he, Smith and Wagner immediately went to a swimming hole. An argument over division of the $6.00 and watch ensued between Smith and Wagner. Smith yelled to Johnson to grab Wagner, and while Johnson held him Smith stabbed him with the ice pick. At Smith's direction Johnson pulled Wagner into the swimming hole and held him under water to ensure his death. They transported his body elsewhere and buried it.

Smith took the stand in his own defense. He admitted that he was in the company of Wagner and Johnson on the night of the murder, but claimed that the robbery was their idea. Although he accompanied them to the second bar and left it with them and the victim, he testified that they drove him straight from the bar to his apartment, because he was too intoxicated by beer and drugs to do

anything but sleep. That was the last, according to Smith, he saw of them that night. No evidence was introduced by the defense to corroborate the alibi.

365 So.2d at 705–06 (footnote omitted). We will develop other facts as they become relevant to our opinion.

## I. NEED FOR AN EVIDENTIARY HEARING

■ Smith contends that the district court erred in refusing to grant him an evidentiary hearing concerning three of his claims for relief—that his counsel rendered ineffective assistance, that the state Rule 3.850 hearing concerning the alleged *Brady* violation was not full and fair, and that his execution in light of recantations by Wesley Johnson would violate due process.[1] Although the legal analysis of Smith's right to a hearing differs greatly for each claim, we discuss them together because each claim has a common factual basis— the numerous statements of Wesley Johnson. We conclude that, under *Thomas v. Zant*, 697 F.2d 977 (11th Cir.1983), the district court should have granted Smith an evidentiary hearing on his claim of ineffective assistance of counsel. Given the interrelationship of this issue with the *Brady* issue, the hearing that must be held will necessarily concern both issues. The district court did not err in refusing a hearing concerning Johnson's recantations.

As the quoted excerpt from the opinion of the Florida Supreme Court indicates, Wesley Johnson was the primary witness against Smith. The record[2] shows that in early September, 1975, Johnson presented himself to the Polk County Sheriff's Department and confessed to three murders. He claimed to have killed Caleb McDowell, John Mitchell Arnsdorff (whom Smith is convicted of murdering), and James Wagner. The transcript of Johnson's statement and the report of the Polk County Sheriff's Office, dated September 6, 1975, indicate that Johnson told the following story concerning the second and third victims.

Johnson met Wagner in a bar in Lakeland, Florida. Johnson and Wagner went to another bar, the Green Parrot, where they met Arnsdorff. The three journeyed first to Johnson's apartment and then to Arnsdorff's, where Johnson and Wagner robbed Arnsdorff of eleven dollars, tied him hand and foot, and put him into the trunk of his car. Johnson and Wagner promised Arnsdorff that they would drive him into the woods and leave him so that, "if he [had] enough energy," he could kick out the back seat of the car.

Johnson and Wagner drove away, but, after leaving Lakeland, they wrecked and the car became stuck in a ditch. Johnson stated that he then opened the trunk and hit Arnsdorff with a jack handle as Arnsdorff begged for mercy. Johnson stated that he stabbed Arnsdorff with the sharp end of the jack and with a knife, while forcing Wagner to watch. Johnson and Wagner then climbed into a second car and drove away. Johnson refused to explain why a second car was with them, although the police asked him to do so. The two drove to a gas station and bought some gas. They then returned to the wrecked vehicle, doused it with gasoline, and set it afire with Arnsdorff in the trunk. This was the extent of what Johnson related concerning Arnsdorff's murder; he did not mention Smith.[3]

---

1. Smith also asked for an evidentiary hearing on other issues. We will address those claims separately.

2. Our record is somewhat unclear concerning some events. For example, it is doubtful that we now have before us all the statements of Wesley Johnson and Patricia Johnson, his wife. *See Smith v. State,* 400 So.2d 956, 953 n. 1 (Fla.1981) (listing statements). Although we believe our construction of the events to be substantially accurate, on remand the district court may expand the record and correct any misconceptions in our opinion.

3. The September 6 statement is relevant to this case for one reason in addition to Johnson's omission of Smith. In describing his murder of McDowell, which occurred two years before the other murders, Johnson indicated that he also locked the victim in the trunk of a car and set the car on fire after dousing it with gasoline.

On September 8, an officer interviewed Wesley Johnson's wife, Patricia Johnson. In this interview, she stated that Wesley had told her that both he and Smith had murdered Arnsdorff. Although Smith submitted this statement to us after argument, it is not in our record. Our record indicates that Patricia Johnson had, however, made a previous statement that omitted any reference to Smith.

On September 10, Patricia Johnson notified the officers that Wesley "wanted to tell the whole story about the three murders." Polk County Sheriff's Report at 6. She asked to meet with Wesley. After talking with his wife, Johnson informed the police that he would prefer not to give a statement until his attorney could discuss a plea bargain. He indicated, however, that Smith had been with him on the night Arnsdorff was murdered and "did take part in the same." *Id.* Sometime subsequent to this, Johnson apparently came to the agreement he desired[4] with the prosecutor and gave a statement implicating Smith. He stated that Smith had been with Wagner and himself on the night of Arnsdorff's murder and that Smith had actually struck Arnsdorff with the tire jack. Johnson stated that Wagner stabbed Arnsdorff with an ice pick while Smith used the jack handle. Johnson then stated that he could not remember "exactly what happened right at the moment .... we all looked around [and] I stepped up and slammed the [trunk]." Johnson also testified that, after returning with the gas, "[we] got out of the car and Slick's [Smith] got the gas can. So I poured the gas all over it. And Slick gets back in the car, and what's his name throwed a match on it." In response to a clarifying question, Johnson indicated Wagner to be the person referred to as "what's-his-name." He also indicated in detail how he (Johnson) doused the car with gasoline.

As far as we can determine, Johnson made one other pretrial statement relevant to our decision. The trial transcript shows

that Johnson sent a note to Smith while both were incarcerated before trial. The note read as follows:

Hey, Slick, how are you doing? Okay? Well, the next time they say court, it's for real. Just keep cool. You can have Parks called because I made sure he heard me talking about how I done it by myself and it's like that. Just heard on the news that they, they are going to bring back the chair. Hope I miss it. Well, just stay cool. Jake.

Apparently, this note indicates that Johnson confessed to another inmate named Parks so that Smith could call Parks at trial to impeach Johnson.

At trial, Johnson testified that Smith murdered Arnsdorff. Smith's counsel impeached Johnson with only the note written concerning Parks. The state then called Patricia Johnson in rebuttal to testify that Wesley had made prior statements consistent with his story implicating Smith. Since the trial, Johnson has made numerous sworn recantations of his trial testimony, stating that he lied at trial when implicating Smith and that he committed the crime himself.

### A. *Effective Assistance Claim.*

In his brief, Smith argues that his trial counsel was ineffective. He lists the following "errors and omissions" at the guilt/innocence phase of the trial:

1. Failure to seek a *Richardson* hearing and challenge the admissibility of the testimony of Patricia Johnson under the rule of sequestration;

2. Failure to use Patricia or Wesley Johnson's pretrial statements for impeachment;

3. Failure to interview Smith adequately; and

4. Failure to depose Wesley Johnson before trial.

Smith also contends that his attorney, during the penalty phase:

---

**4.** Johnson testified at Smith's trial that he agreed to plead no contest to the three murders and testify against Smith in exchange for con-

current life sentences. Johnson was sentenced after Smith's trial.

1.  Failed to adduce appropriate mitigating evidence or properly use that evidence in closing argument;

2.  Failed to seek jury instructions on reasonable doubt or object to other instructions;

3.  Failed to understand the bifurcated proceeding; and

4.  Failed to challenge the use of the heinous, atrocious, and cruel aggravating circumstance.

■ In *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the test under which we review claims of ineffective assistance. *See also Jarrell v. Balkcom,* 735 F.2d 1242, 1261 (11th Cir.1984). The petitioner must show both that his attorney failed to render "reasonably effective assistance," *id.* at 2064, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 2068. With some exceptions not applicable here, *see id.* at 2067; *see also United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the inquiry is two-pronged. The petitioner must show both ineffective assistance and resulting prejudice.

In this case, only one of Smith's claims—that counsel should have more effectively impeached the Johnsons—merits discussion and possible relief. The claimed failure of his attorney to understand the bifurcated proceeding and act as an advocate is related to the failure to impeach issue. The other claims are either unsupported by the record or simply do not merit relief.[5]

Counsel's failure to depose Johnson does not warrant relief or a hearing; given the numerous inconsistent statements made by Johnson and his wife, counsel probably had no need to conduct such a deposition. Had a deposition produced testimony detrimental to Smith, it would have been available to the state as evidence to disprove recent fabrication. (The state Rule 3.850 court held that Smith's counsel had available all the statements we have set forth above.) We are unable, without an evidentiary hearing, to reach a conclusion concerning ineffectiveness in light of counsel's failure to cross-examine Wesley or Patricia Johnson by using their pretrial statements, however.[6] The district court concluded that the attorney failed to use the statements for a valid strategic reason: he preferred to emphasize Johnson's plea bargain for impeachment purposes. Without a hearing,[7] we cannot hold this to be a valid reason for counsel's failure to use the Johnsons' statements not implicating Smith. Use of these statements would have been totally consistent with counsel's assumed strategy of showing that Johnson implicated Smith only to save himself from the electric chair.

We also hold that counsel's failure to use the statements may well have resulted in prejudice under the test in *Strickland v. Washington.* The entire case of the state, with the exception of plaster casts of a tire track and a shoe print,[8] was based on the testimony of Wesley Johnson as buttressed by Patricia Johnson's testimony during the state's rebuttal case. When first questioned, however, neither witness implicated Smith: the September 6 statements[9] of both witnesses omit any reference to

---

5.  For a discussion of the claims regarding erroneous jury instructions and the application of the heinous, atrocious and cruel aggravating factor, *see infra* section VII (discussing claims in context of ineffective assistance of appellate counsel). Our conclusion concerning these issues does not change in light of the different test for appraising the effectiveness of trial counsel.

6.  The entire transcript of the cross examination is attached to this opinion as Appendix A.

7.  A hearing will also be helpful to clarify the record. *See supra* note 2.

8.  The tire track matched Smith's car's tires; the shoe print matched a pair of shoes Smith owned. Smith explained that he had loaned his car, with the shoes in the back seat, to Johnson.

9.  Other, more minor, inconsistencies appear among Johnson's statements. For example, Johnson's trial testimony cast Smith more as the ringleader than did his statement made after September 10.

Smith. Only after Patricia Johnson conferred with Wesley on September 10 did Wesley implicate Smith—stating that Smith was involved, but that a plea bargain discussion must occur before he would provide any further information.

Two conclusions may be drawn from these facts. The first is that Wesley and Patricia Johnson "framed" Smith, as Wesley's recantations would indicate. This conclusion is supported by the timing and order of the statements, and, to some extent, by Johnson's admission on September 6 that he locked his first victim in the car trunk and set the car on fire. Smith's attorney might well have argued that Johnson—who had a history of similar murders—implicated Smith to avoid "the chair," as Johnson stated in his note. The second, contradictory conclusion is that Wesley simply omitted any reference to Smith for some unknown reason—and later told the truth. This interpretation is supported by Johnson's suspicious reference to a second car in his September 6 statement without elaborating concerning its source or its driver. Nevertheless, the choice between the two interpretations would have been one the jury could have made either way had they heard the facts. The jury's choice could well have affected the outcome of the trial.

The failure of counsel to use the statements to impeach the Johnsons may not only have affected the outcome of the guilt/innocence phase, it may have changed the outcome of the penalty trial. As we have previously noted, jurors may well vote against the imposition of the death penalty due to the existence of "whimsical doubt." In rejecting the contention that the Constitution requires different juries at the penalty and guilt phases of capital trial, we stated:

The fact that jurors have determined guilt beyond a reasonable doubt does not necessarily mean that no juror entertained *any* doubt whatsoever. There

may be no *reasonable* doubt—doubt based upon reason—and yet some *genuine* doubt exists. It may reflect a mere possibility; it may be but the whimsy of one juror or several. Yet this whimsical doubt—this absence of absolute certainty—can be real.

The capital defendant whose guilt seems abundantly demonstrated may be neither obstructing justice nor engaged in an exercise in futility when his counsel mounts a vigorous defense on the merits. It may be proffered in the slight hope of unanticipated success; it might seek to persuade one or more to prevent unanimity for conviction; it is more likely to produce only whimsical doubt. Even the latter serves the defendant, for the juror entertaining doubt which does not rise to reasonable doubt can be expected to resist those who would impose the irremedial penalty of death.

*Smith v. Balkcom,* 660 F.2d 573, 580–81 (5th Cir. Unit B 1981), *modified,* 677 F.2d 20, *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). In this case, use of Wesley and Patricia Johnson's prior inconsistent statements might have created a whimsical doubt that would discourage the court and advisory jury from recommending the death penalty.

Of course, counsel may have elected to choose another strategy at the penalty portion of Smith's trial. If he did so, however, the record does not reveal the content of the strategy. For example, in counsel's closing statement at the penalty phase,[10] he evidenced no reasonable strategy. Counsel stated (in full):

MR. HADDOCK: May it please the Court? Ladies and gentlemen, this is the last time we will be before you. The most trying circumstances, the fact that will be sent back to you will be cumulative of what you have already decided, that the defendant is guilty. Now, with little help except from you—and you are

---

10. We note that counsel was somewhat confused by the bifurcated proceeding in any event. He repeatedly requested that the judge abandon the bifurcated procedure and use the procedure

declared unconstitutional in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

not here to help me, you are here to do the right thing—I have to ask that you take into consideration all of the things that have been said, all of the things that have been admitted into evidence. In particular, consideration to the statements of Dr. Kaplan pertaining to Mr. Smith.

Weigh those, because they weigh heavily upon everybody in this room. Add them up. If they indicate to you that this man, who has made a statement that you can take or leave—because you have taken and left some of his statements—that he would spend the rest of his life in a penitentiary. Whether this man should die or be given the right to live until, God willing, someday this state will provide a place for him.

If the state desires to do so, on remand it is free to introduce evidence before the district court showing that trial counsel's failure to utilize the Johnsons' statements at either the guilt/innocence or penalty phases of the trial was prompted by reasonable trial strategy.

### B. *The* Brady *Issue.*

Smith contended before the state Rule 3.850 court that he did not receive material evidence from the state before trial pursuant to his request under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The state court held a hearing and concluded that the requested material was available to Smith's counsel. Smith now contends that this finding of fact by the state court is incorrect and not entitled to a presumption of correctness under 28 U.S.C. § 2254(d) because his trial counsel never testified at the hearing. He notes that the testimony at the hearing indicated that the prosecutor, although he maintained an "open file" policy, could not recall whether the various statements were in the file at any particular time. Smith

himself testified that he could not recall seeing or hearing about the statements, except for the statement made after September 10 by Wesley Johnson.

We do not hold that these circumstances support a finding that the hearing was not full and fair; [11] indeed, we see no need to pass on this question. When the district court conducts its hearing on the effectiveness of Smith's counsel, the inquiry will by necessity involve the availability of the statements. For example, the state might produce Smith's counsel and introduce his testimony that he did not use the statements because he did not have them. If he did not have them because he did not check the prosecutor's file, this would constitute ineffective assistance given the content of the statements. But, if the statements were not available, counsel could not use them.

If the district court should conclude after an evidentiary hearing that the statements were not available to trial counsel, Smith will be confronted with a variation of Catch-22 created in part by 28 U.S.C. § 2254(d). The state could presumably argue that state court's finding that the statements were available is a historical fact entitled to a presumption of correctness, but that counsel rendered effective assistance under the circumstances because the statements were, in fact, unavailable. Such a situation no doubt results from the difficulties inherent in the administration of justice by means of the writ of habeas corpus. Nevertheless, if this situation arises, the district court should conclude that, under 28 U.S.C. § 2254(d)(3), "the material facts were not adequately developed at the state court hearing," *see Thomas v. Zant,* 697 F.2d 977, 980 (11th Cir.1983), and issue the writ under *Brady v. Maryland.*[12] We have no doubt that

---

11. For example, Smith does not explain why he could not have deposed his attorney, even if he was unable to subpoena him. *Cf. Birt v. Montgomery,* 725 F.2d 587, 590 n. 5 (11th Cir.1984) (en banc) (noting possibility that petitioner could depose witness without passing on sufficiency of state hearing).

12. Smith correctly notes that the state court's finding was supported by somewhat weak evidence. In addition, the state court did not hold an evidentiary hearing on Smith's effective assistance of counsel contention, although he requested a hearing.

statements were "material either to guilt or to punishment" under *Brady.* 373 U.S. at 87, 83 S.Ct. at 1196.

### C. *Recantations of Wesley Johnson.*

Finally, Smith contends that the district court should also receive evidence concerning the post-trial recantations of Wesley Johnson. A panel of this court recently addressed a similar claim in *Drake v. Francis,* 727 F.2d 990 (11th Cir.1984). This court vacated the opinion in *Drake* for en banc consideration, and we recently received briefs and heard oral argument on several issues raised in *Drake.* We see no need to hold this case pending the decision in *Drake,* however. We perceive that the panel in *Drake* accurately stated the law in this circuit concerning claims of newly discovered evidence in habeas corpus proceedings.

As long ago as 1958, the former Fifth Circuit Court of Appeals summarized the law in this area: "Newly discovered evidence in the form of a confession by another does not render the conviction void and subject to collateral attack by habeas corpus because it goes to the merits of the conviction, not its legality." *Shaver v. Ellis,* 255 F.2d 509, 511 (5th Cir.1958), *cert. denied,* 355 U.S. 864, 78 S.Ct. 98, 2 L.Ed.2d 70 (1957). To be distinguished are situations in which the new evidence bears directly on the constitutionality of the conviction. For example, in *Schneider v. Estelle,* 552 F.2d 593 (5th Cir.1977), the petitioner claimed new evidence would show that the state had suborned perjury in obtaining a conviction against the petitioner. The court remanded for an evidentiary hearing, holding that the writ should issue if the petitioner proved the allegations of his complaint. *Id.* at 596; *see also Smith v. Florida,* 410 F.2d 1349 (5th Cir.1969).

■ In this case, we seriously doubt that Smith has alleged subornation of perjury by the state. To prove such a claim, Smith would have to show that the prosecutor or the police officers knew that the testimony of one of the Johnsons was false. *Schneider,* 552 F.2d at 595; *Smith,* 410 F.2d at 1350–51. Smith has made no proffer of any evidence supporting such a contention. Absent such evidence, this claim does not warrant habeas corpus relief.

### II. COERCION OF TESTIMONY

Smith next contends that Johnson confessed and agreed to testify for the state only because of Johnson's fear of the death penalty. Smith notes that one of the terms of Johnson's plea bargain required him to testify before he received his sentence. Smith argues that he should have received an evidentiary hearing on this issue in the district court.

We have little difficulty accepting the validity of the argument that Johnson entered into his plea bargain agreement with the state and testified against Smith because of the possible imposition of the death penalty. Nevertheless, the district court properly held that this claim affords Smith no basis for relief.

■ We have substantial doubt that this claim is one that warrants relief. *Cf. United States v. Ballard,* 586 F.2d 1060 (5th Cir.1978); *Chaney v. Wainwright,* 561 F.2d 1129 (5th Cir.1977), 443 U.S. 904, 99 S.Ct. 3095, 61 L.Ed.2d 871 (1979). It is clear that Smith's attorney cross-examined Johnson and revealed the facts underlying Johnson's testimony to the jury, which decided whether or not to believe Johnson. We need not consider this issue on its merits, however, because Smith failed properly to raise it under Florida procedure. The Florida courts have refused to address the issue, *see Smith v. State,* 400 So.2d 956, 959 (Fla.1981); and, absent a showing of cause for failure properly to preserve the issue and resulting prejudice, the issue is barred from review in the federal courts, *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1976). Smith has shown neither cause nor prejudice.

### III. ADMISSION OF EVIDENCE OF SECOND MURDER

At Smith's trial, the judge allowed Wesley Johnson to testify concerning the facts of a second murder for which Smith was

not on trial. (The circumstances and content of this testimony are set forth in the portion of the Florida Supreme Court's opinion quoted in the introductory portion of this opinion.) The Florida court apparently admitted this testimony on the theory that it constituted part of the *res gestae*. *See Smith v. State*, 365 So.2d 704, 706 n. 2 (Fla.1978). Smith contends that the evidence was irrelevant, inflammatory, prejudicial, and inadmissible as a matter of constitutional law.

■ In reviewing the disposition of this claim by the district court, we note that "[i]n order for an evidentiary ruling to be cognizable in habeas corpus, it must deprive the state court defendant of fundamental fairness." *Jameson v. Wainwright*, 719 F.2d 1125, 1126 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2355, 80 L.Ed.2d 827 (1984); *see also Hills v. Henderson*, 529 F.2d 397 (1976). A denial of fundamental fairness occurs when the evidence is "material in the sense of a crucial, critical, highly significant factor." *Id.* at 1127. Under this test, the admission of the evidence did not violate the Constitution, although its admissibility under state law presents a close and difficult question. *See* 365 So.2d at 708 (three Justices dissenting).

### IV. TESTIMONY OF PATRICIA JOHNSON

■ At Smith's trial, the state introduced the testimony of Patricia Johnson, Wesley Johnson's wife. (Wesley Johnson was the prosecutor's essential witness. *See supra* § I.) The prosecutor called Patricia Johnson to testify concerning prior consistent statements made by her husband in response to Smith's impeachment. The witness list submitted to Smith before trial by the prosecutor did not include Patricia Johnson's name, as Florida law requires. In addition, the record shows that Patricia Johnson was present during a portion of the trial that preceded her testimo-

ny and was thus in violation of the sequestration rule. Smith argues that the omission of Patricia Johnson's name from the witness list and the sequestration rule violation compels the issuance of the writ. Smith, however, cites no authority to the effect that these violations are of constitutional dimension. *See, e.g., Bronstein v. Wainwright*, 646 F.2d 1048 (5th Cir.1981) (state law violations do not usually warrant habeas relief). Assuming that the claim is simply one rooted in the concept of "fundamental fairness," *see Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), we conclude that these violations (if they were violations)[13] did not render Smith's trial fundamentally unfair.

### V. TESTIMONY OF DR. NISWONGER

■ Dr. Joseph K. Niswonger, a psychiatrist, examined Smith before trial. Niswonger testified that, during the examination, Smith claimed amnesia concerning the events of the murder. The state argued to the jury that this testimony contradicted Smith's alibi that he did not commit the murder, but was at home "sleeping off a drunk." Smith now contends that, under the rule of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), Niswonger's testimony was inadmissible because Niswonger did not read Smith *Miranda* warnings before conducting the psychiatric examination. *See also Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981). The state contends that this claim is barred from consideration by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1976), and that the claim also fails on the merits. The state's argument concerning the merits of this claim is correct; we therefore chose not to address the *Wainwright* issue, which presents a question of law not yet squarely addressed by this court.

The record in this case shows that the trial court did not appoint Niswonger to examine Smith, as was the case in *Estelle*

13. The prosecutor explained the omission of Patricia Johnson's name from the list and her presence in the courtroom by contending that

he had not forseen that he would call her as a witness.

*v. Smith.* On the contrary, Smith retained Niswonger (through his trial counsel) to conduct an examination regarding a possible claim of insanity. In such a case, *Estelle v. Smith* does not require that the psychiatrist give *Miranda* warnings.[14] The protections of *Estelle* do not apply unless the psychiatrist is "essentially ... an agent of the State ...." 451 U.S. at 467, 101 S.Ct. at 1875.[15] Thus, the district court properly denied the writ on this issue.

## VI. DISPARITY IN SENTENCING

After the penalty hearing, the trial judge sentenced Smith to death. Wesley Johnson, in accordance with his plea bargain, received a sentence of only twenty-five years in prison. Smith contends that this disproportionate punishment violates the Constitution given his "lesser culpability" than Johnson. He requests this court to conduct an independent review of the record and grant relief on this issue, citing as support *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). This contention lacks merit. *See generally Pulley v. Harris,* — U.S. —, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Collins v. Francis,* 728 F.2d 1322 (11th Cir.1984); *Moore v. Balkcom,* 716 F.2d 1511 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *Henry v. Wainwright,* 721 F.2d 990 (5th Cir. Unit B 1983), *cert. denied,* — U.S. —, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

## VII. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Smith next contends that the district court should have granted him an evidentiary hearing on his claim that his appellate counsel rendered constitutionally ineffective assistance. We recently described the legal basis for this type of claim in *Alvord v. Wainwright,* 725 F.2d 1282 (11th Cir.1984), as follows:

Although we address claims of ineffective assistance of counsel on appeal much less frequently than claims of ineffective assistance at trial, it is well established that a defendant has the right to effective counsel on appeal. *See Anders v. California,* 386 U.S. 738, 741–42, 744, 87 S.Ct. 1396, 1398–99, 1400, 18 L.Ed.2d 493 (1966) (counsel must function as advocate on behalf of client). In order to prevail, Alvord must prove that he did not receive " 'reasonably effective representation,' " *Mylar v. Alabama,* 671 F.2d 1299, 1300 (11th Cir.1982) (citing previous cases), *cert. denied,* [— U.S. —] 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983); however, counsel need not provide perfect assistance, *id.* From the reported cases, it appears that counsel's failure to file a brief is in most cases ineffective, *see Anders; Mylar;* however, counsel's failure to advance errors on appeal later gaining "judicial recognition" does not constitute unconstitutional aid. *Sullivan v. Wainwright,* 695 F.2d 1306, 1309 (11th Cir.), *cert. denied,* [— U.S. —] 104 S.Ct. 290, 78 L.Ed.2d 266 (1983), and counsel need not brief issues reasonably considered to be without merit, *Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir. Unit A. 1981); *Hooks v. Roberts,* 480 F.2d 1196, 1197–98 (5th Cir.1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). Alvord contends that the issues not raised by his counsel were of substantial merit. As we stated in *Hooks,* the best way to evaluate "this question ... is to examine the alleged trial errors to see if they contain sufficient merit ... that his appellate counsel can be faulted for not having raised them." 480 F.2d at 1197.

*Id.* at 1291. Under the applicable standards, we conclude that Smith's counsel

---

14. Smith apparently does not contend that all psychiatrists examining all defendants must give *Miranda* warnings to remind the defendant not to make a statement he later may regret.

15. Smith contends that the trial judge's post-trial order adding Niswonger to the list of state psy-

chiatrists made Niswonger an agent of the state. This contention is without merit. The judge's revision of the list did not change Niswonger's *de facto* status during the examination or at trial.

rendered constitutionally effective assistance and that no evidentiary hearing is required.

Smith first contends that his counsel should have challenged on appeal the admissibility of photographs of the victim's body during the penalty phase of the trial. We cannot fault Smith's attorney for omitting this claim. The photographs were clearly relevant to the case because the state relied on the "heinous, atrocious, or cruel" aggravating circumstance enumerated in the Florida statute. *See* Fla.Stat. § 921.141(5)(h). The circumstances of the crime as evidenced by the condition of the victim's body are material to consideration of this aggravating circumstance. In addition, under Florida law, it appears to be settled that such photographs are admissible. *See Calloway v. State,* 189 So.2d 617 (Fla.1966); *Mardorff v. State,* 143 Fla. 64, 196 So. 625 (1940).

Smith next contends that his counsel should have argued that the Florida procedure providing for a bifurcated sentencing hearing is unconstitutional. This contention lacks merit. The Supreme Court specifically upheld this statute in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and we recently rejected this claim in *Smith v. Balkcom,* 660 F.2d 573, 580–81 (5th Cir. Unit B 1981), *modified,* 677 F.2d 20, *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

Smith argues that his counsel should have challenged the trial court's decision to admit Dr. Niswonger's testimony at the penalty phase of his trial. Counsel need not have raised this claim on the basis of the fifth amendment; we have decided above that such a challenge lacks merit. *See supra* § V. In addition, counsel could reasonably have concluded that Smith had waived the psychiatrist-patient privilege by introducing Dr. Niswonger's report as to Smith's sanity into evidence at the competency hearing. *See* Fla.Stat. § 90.242(b) (providing for waiver of privilege).

Smith also argues that his appellate attorney wrongly failed to challenge the trial court's finding of the "heinous, atrocious, or cruel" aggravating circumstance. *See* Fla.Stat. § 921.141(5)(h). Smith contends that Johnson's testimony at trial demonstrated that the "participants" thought the victim to be dead after they kidnapped him, transported him a considerable distance in a car trunk, struck him with a tire tool (while he pleaded for mercy), stabbed him with an ice pick, and locked him back in the car trunk. Thus, although the medical reports later showed that the victim died when the participants poured gasoline on the car and burned it, the murderer(s) could not have known they had done anything except destroy evidence. Under *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), Smith contends that this was not a proper case for application for the subsection (5)(h) circumstance. We believe Smith's counsel could reasonably decide not to raise this issue on appeal.

Smith next contends that his appellate counsel should have challenged the trial court's jury instructions, which did not explain that the state must prove the existence of aggravating circumstances beyond a reasonable doubt. *See Williams v. State,* 386 So.2d 538 (Fla.1980). The district court noted: (1) that trial counsel never requested such a charge, and (2) that the jury never was charged concerning any burden of proof except that of beyond a reasonable doubt. We hold that, under the circumstances, counsel need not have raised this issue on appeal. *See Alvord,* 725 F.2d at 1292 (instruction never requested); *Henry v. Wainwright,* 721 F.2d 990, 995 (5th Cir. Unit B 1983) (jury never heard instruction on any other burden of proof), *cert. denied,* —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

Finally, Smith contends that his attorney should have requested the court reporter to transcribe the entire voir dire proceedings to determine whether a violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), occurred. This contention is purely speculative; Smith has not shown that, in fact, a violation occurred. Thus, Smith has neither alleged

nor proven that the failure of his attorney to raise this issue made any difference whatsoever.

## VIII. MISCELLANEOUS ISSUES

■ Smith contends that the death penalty in Florida has been discriminatorily applied on the basis of the race of the victim; he argues that the district court erred in refusing to grant an evidentiary hearing on this issue. The district court acted properly; as the state notes, this issue has been conclusively resolved adversely to Smith. *See Sullivan v. Wainwright*, 721 F.2d 316 (11th Cir.1983), *application for stay denied, Sullivan v. Wainwright*, —— U.S. ——, 104 S.Ct. 450, 78 L.Ed.2d 210 (1983); *Wainwright v. Ford*, —— U.S. ——, 104 S.Ct. 3498, 82 L.Ed.2d 911 (1984); *Adams v. Wainwright*, 709 F.2d 1443, 1449 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984); *Washington v. Wainwright*, 737 F.2d 922, 923 (11th Cir.1984).

■ In this section of his brief, Smith also challenges the use of non-record material by the Florida Supreme Court in reviewing his case. This issue has also been resolved adversely to Smith. *See Ford v. Strickland*, 696 F.2d 804 (11th Cir.1983) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

■ Smith also argues that his sentence is unconstitutional because of the trial judge's faulty instructions to the jury concerning aggravating and mitigating circumstances and because the trial judge misapplied the law concerning the use of the circumstances by relying on an unconstitutional circumstance. Without belaboring this point, we hold that the district judge correctly decided that this claim is barred by a procedural default under *Wainwright v. Sykes.* Smith contends that he has proffered facts entitling him to an evidentiary hearing on the issue of cause and prejudice, but we disagree. As to the claims concerning restrictions of mitigating evidence, Smith has failed to show prejudice for exactly the reasons enumerated in *Ford v. Strickland*, 696 F.2d at 812–13.

And, as to the claim of reliance on an unconstitutional aggravating circumstance, Smith has failed to proffer any evidence or explanation constituting cause for his failure timely to raise this issue in the state court.

The judgment of the district court is AFFIRMED IN PART, VACATED IN PART, and REMANDED for proceedings not inconsistent with this opinion.

## APPENDIX A

### CROSS–EXAMINATION OF WESLEY JOHNSON

EXAMINATION BY MR. HADDOCK:

Q Mr. Johnson, you are putting me in the unique position of asking you a direct question, which I doubt I will get a straight answer from you about it.

MR. CAMPBELL: Now, Your Honor,——

Q When are you lying, then or now?

THE COURT: Mr. Haddock, I don't want any dialogue of that sort.

MR. HADDOCK: That was a proper question, Your Honor.

THE COURT: Ask a question, but I don't want dialogue. I don't want editoralizing.

MR. HADDOCK: Prior to asking any questions, Your Honor, I would like at this time to move for a mistrial in this case because of the unnecessary presentation of evidence over my prior objection out of the absence of the jury pertaining to a separate crime for which this defendant has been individually indicted and upon which there is a separate case before the Court, and upon which the defendant stands the possibility of subsequent trial.

THE COURT: Motion denied.

MR. HADDOCK: This is so horrendous, it's so prejudicial—

MR. CAMPBELL: How many times do we have to go through the same thing, Your Honor?

THE COURT: Just a moment, Mr. Campbell. Go ahead.

**1262**

MR. HADDOCK: May I finish, Your Honor? This is so horrendous and prejudicial to the defendant's cause before the jury that I see virtually no way of ever getting it straightened out.

THE COURT: Motion denied.

Q Answer my question, Mr. Johnson.

MR. CAMPBELL: I thought that question was objected to.

THE COURT: You will have to reask the question.

Q Are you telling the truth now or when you testified to the police officers?

A I am telling the truth now.

Q Let me ask you something. Have you ever seen this before [indicating]?

A Yes.

Q What is it?

A That is a confession, I suppose, it's a note I sent [indicating].

Q Was it written by you?

A Yeah.

Q Signed by you as Jake?

A Yeah.

Q Is that a name you are known by from time to time?

A Yeah.

Q How was it, what was disposed—what was the disposition of this note, if you know?

A It was at a time when I was thinking about cutting him loose.

Q Speak up.

A At a time when I was thinking about cutting him loose.

Q Was it addressed to—did you have it sent to Smitty?

A Yes.

MR. HADDOCK: Your Honor, I would like to introduce this into evidence.

MR. CAMPBELL: No sir, not—

THE COURT: It would be proper to identify it now and introduce it later.

MR. HADDOCK: I think I can introduce it since he is the State's witness.

MR. CAMPBELL: No sir, you can't introduce it in the State's portion of the case.

THE COURT: That's right. You mean the Court's witness?

MR. HADDOCK: The Court's witness.

THE COURT: It will be identified as Defendant's Exhibit 1. [The purported confession was marked as Defense Exhibit 1 for identification.]

Q Does this note say, can you read that note?

A Do you want me to read it out loud?

Q Read it to the jury, yes.

A "Hey, Slick, how are you doing? Okay? Well, the next time they say court, it's for real. Just keep cool. You can have Parks called because I made sure he heard me talking about how I done it by myself and it's like that. Just heard on the news that they, they are going to bring back the chair, I hope I miss it. Well, just stay cool, Jake."

Q And Jake is you?

A Part-time.

Q That's right? You are Jake?

A Sometimes.

Q What is your deal with the state?

A 25 to life.

Q How many crimes did you confess to?

MR. CAMPBELL: Judge, that—

A Three.

MR. CAMPBELL: —Your Honor, I don't have any objection to those related to—no. I withdraw the objection. I believe the answer was three.

THE COURT: That's correct.

Q And you say what, 25 to life?

A [Nods head.]

Q Were there any stipulations pertaining to that?

A What do you mean, to the sentence?

Q Yes.

A That I testify.

Q Testify to what?

A To the murders.

Q Did it have anything to do with the implication of the defendant here, Mr. Smith?

A Yes.

Q And that was part of the deal?

A That I testify to the murders for the state, yeah.

Q And have you been sentenced yet?

A No, not that I know of.

Q Is it your understanding that you will not be sentenced until after you give your testimony?

A Right.

Q Therefore your testimony is based upon your not going to the electric chair, is that right?

A Well, I'm talking, uh, yeah, I suppose so.

Q You are frightened of going to the electric chair, aren't you?

A Scared to death.

Q Jake, how long had you been drinking before you got involved in this thing?

A Um, off and on during the day.

Q Had you had any narcotics?

A No.

Q Any sort of marijuana or anything other than alcoholic beverages?

A No.

Q How much alcoholic beverages had you drunk?

A That's hard to say.

Q Well, kind of work on it a little bit, see what you can come up with. It hasn't been too hard for you to say a lot of other things.

MR. CAMPBELL: Your Honor—

A I'm thinking.

THE COURT: Mr. Haddock, don't do that.

A Maybe a case before I met up with him.

Q A case of what?

A Maybe three or four six-packs.

Q Four would be twenty, twenty-four beers, is that correct?

A I suppose.

Q Were you drinking short beers or long ones?

A Short.

Q Were you drunk?

A I was feeling all right.

Q How come you said in your deposition you were trying to decide whether you were going to get out and puke if you were feeling all right?

A Well, you know, pretty gross scene is going on.

Q The alcohol didn't have anything to do with it?

A Not very much.

Q Did you drink, you said something about you may have had some whiskey during this time, I believe, whatever kind of testimony it was you gave to the state?

A Right.

Q So you mixed whiskey with possibly 24 beers in the course of the day?

A Yes.

Q You are just clear-headed as you can be, you remember everything that went on?

A Pretty much so.

Q Are you an alcoholic?

A I don't know.

Q You drink 24 beers everyday?

A Sometimes more.

Q Sometimes more?

A Yeah.

Q How much do you weigh?

A How much do I weigh?

Q Yes sir.

A About 150.

Q 150?

A I guess about.

Q You don't know?

A Not really, sir.

Q So you are in a position now—let me see if I have got this straight—of having given testimony against Mr. Smith with the promise from the state that if you did so you, who admit that you were involved in crimes, will get a sentence of from 25 years to life?

MR. CAMPBELL: Your Honor, I don't think that is the correct statement of the situation. I don't think the state promised him a thing.

THE COURT: You will have the opportunity to ask questions on redirect.

MR. HADDOCK: Thank you, Your Honor.

MR. CAMPBELL: All right.

MR. HADDOCK: Will you reread him the question to make sure he got it?

[The reporter read back the previous question.]

A It's not 25 to life. It's a life sentence, whereas on first degree murder I have to do at least 25 years before I am eligible for parole is the type of life sentence I will be receiving. And if I don't get off then, between now and then, the next 25 years I plan on making parole.

Q Was there additional promises that these sentences would be together instead of one after the other?

A Concurrently, yes.

Q In other words, you would get a concurrent sentence, only one life sentence?

A Yes sir.

Q Any other witnesses other than you and Birdman and Smith?

A Not that I know of, no.

Q So there is just you now and Smith?

A Right.

Q That's the way it is, isn't it?

A Right.

Q And you got 25 years if you behaved yourself, and we don't know what Smith has got, is that right?

A Right.

MR. HADDOCK: That's all, Your Honor. No further inquiry.

EXAMINATION BY MR. CAMPBELL:

Q Mr. Johnson, you have, have pled no defense to—Mr. Haddock asked you how many crimes you have confessed to and you said three. You have pled no defense to each of those three crimes?

THE COURT: Mr. Campbell, may I see you and Mr. Haddock? [The following conference was held at the bench outside the hearing of the jury:]