**Dewayne HULSEY, Appellee,**

**v.**

**Willis SARGENT, Superintendent, Cummins Unit, Arkansas Department of Correction, Appellant.**

**No. 88–1148.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 20, 1988.

Decided Jan. 19, 1989.

As Amended on Denial of Rehearing and Rehearing En Banc March 13, 1989.

Jack Gillean, Asst. Atty. Gen., Little Rock, Ark., for appellant.

Everett C. Johnson, Washington, D.C., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

LAY, Chief Judge.

In *Hulsey v. Sargent*, 821 F.2d 469 (8th Cir.1987), this court remanded for reconsideration the district court's earlier decision to vacate Hulsey's death sentence, in light of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). On remand, the district court held that because

the state trial court applied an incorrect legal standard, its factual finding that juror Creamer was properly excused for cause was not fairly supported by the record. The district court therefore concluded that the presumption of correctness, under 28 U.S.C. § 2254(d), should not attach to the state court's findings. Hence, upon reconsideration, the district court again vacated Hulsey's death sentence. The State once again appeals. We reverse and remand with directions to dismiss Hulsey's petition for a writ of habeas corpus.

The district court found that the state trial court excluded the juror based upon the single affirmative response that she could not vote for the death penalty regardless of the evidence. The state judge, supposedly relying on footnote 21 of *Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968), had found that the juror was unequivocally opposed to the death penalty and therefore could be excused by the State for cause. The district court held this was error since the state court did not ascertain, in light of other equivocal answers, whether despite her beliefs Creamer would have been able to follow her oath, i.e., whether she would *automatically* vote against the death penalty notwithstanding the law and her oath to follow the court's instructions. In other words, the district court held that the trial judge misapplied the *Witherspoon* test. On this basis the district court found that deference to a state court finding of fact was not appropriate where such a finding was based on a misapplication of federal law. *See Gray v. Mississippi*, 481 U.S. 648, 661 n. 10, 107 S.Ct. 2045, 2053 n. 10, 95 L.Ed.2d 622 (1987). Because the district court felt the state court applied an incorrect legal standard it concluded that the factual finding was not fairly supported by the record and did not apply the presumption of correctness thereto. *See* 28 U.S.C. § 2254(d)(8).

At the time of Hulsey's trial in 1975 the state court was acting under its interpretation of *Witherspoon*. *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Witt* had not been decided. If the strict requirements of *Witherspoon* were deemed controlling we would have serious concerns about the state trial court's application of that standard. Mrs. Creamer's equivocal answers would seem to challenge the requirements espoused in *Witherspoon* that the juror's bias against the death penalty be "unmistakably clear," such that the juror would automatically vote against the death penalty. This was, of course, the district court's understandable response in its first opinion. However, we noted in our remand, 821 F.2d at 471, that *Witt* had not been decided at the time of the district court's opinion. We remanded to the district court for further consideration in light of the clarifying principles of *Witt*.

In *Witt* the Supreme Court rejected footnote 21 of *Witherspoon* as dicta and reaffirmed the standard articulated in *Adams*. *Witt*, 469 U.S. at 420, 422, 105 S.Ct. at 850, 851. As the Court stated, this standard is whether the juror's view would "prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Id.* at 424, 105 S.Ct. at 852. The Court thereby rejected "automatic" decisionmaking as well as the notion that bias be proved with unmistakable clarity. In this regard, the Court stated:

> What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. * * * [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424–26, 105 S.Ct. at 852–53 (footnote omitted).

We disagree with the district court's refusal to apply § 2254(d) and the presumption of correctness to the state court's finding. The state court applied the only standard then thought available. Whether the state court applied *Witherspoon* erroneously is immaterial to our discussion. In passing on the petition for a writ of habeas corpus the district court was required to appraise the record in light of the less stringent standard under *Witt.*

The district court found that the prosecutor did not inquire as to whether the prospective juror could perform her duties as a juror in accordance with her oath and the court's instructions. *Cf. Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We perceive the fundamental difference between *Witherspoon* and the *Adams–Witt* rule to be one of lessened degree as to the burden of proof.[1] In order to exclude a juror under *Witt* the State no longer must show that it is unmistakably clear that the juror's opposition to capital punishment would automatically cause exclusion. The *Witt* standard is one that requires the trial court to find that the juror's views would "prevent *or substantially impair* the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath."[2] *Witt,* 469 U.S. at 424, 105 S.Ct. at 252 (emphasis added).

After discussing this change of emphasis in the standard the Supreme Court then turned to stress the degree of deference that a federal habeas court must pay to a state trial judge's determination of bias. In discussing its decision in *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), concerning the applicability of § 2254(d), the Court in *Witt* stated:

> Last Term, in *Patton, supra,* we held that a trial judge's finding that a particular venireman was not biased and therefore was properly seated was a finding of fact subject to § 2254(d). We noted that the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review; "[t]he respect paid such findings in a habeas proceeding certainly should be no less." *Id.,* at 1038, 104 S.Ct. at 2892.

\* \* \* \* \* \*

Once it is recognized that excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias, *Patton* must control. The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant

---

1. Justice Brennan writes that what the majority in *Witt* does is retrench from the "stringent standards of proof" required in *Witherspoon.* *Witt,* 469 U.S. at 452, 105 S.Ct. at 867 (Brennan, J., dissenting).

2. The Supreme Court noted that the language of the *Witherspoon* standard was outdated; it could not be "squared with the duties of present-day capital sentencing juries." *Witt,* 469 U.S. at 421, 105 S.Ct. at 851. This is because the *Witherspoon* jury was vested with unlimited discretion in the choice of sentence. However, as the Court explained in *Witt,* such is no longer the case:

> After our decisions in *Furman v. Georgia,* 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972), and *Gregg v. Georgia,* 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976), however, sentencing juries could no longer be invested with such discretion. As in the State of Texas,

> many capital sentencing juries are now asked specific questions, often factual, the answers to which will determine whether death is the appropriate penalty. In such circumstances it does not make sense to require simply that a juror not "automatically" vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially.

*Id.* at 422, 105 S.Ct. at 851 (footnote omitted).

function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the "factual issues" that are subject to § 2254(d).

*Witt*, 469 U.S. at 428–29, 105 S.Ct. at 854–55 (footnotes omitted).

The state court voir dire of Mrs. Creamer was as follows:

"THE COURT: Do you know of any reason why, if selected to serve as a juror in this case, you could not try the case fairly and impartially, based solely on the evidence and the facts as you hear from the witness stand, and the instructions of the Court?

"MRS. CREAMER: No, sir, I know of no reasons why.

  *   *   *   *   *   *

"MR. RAFF: * * * Mrs. Creamer, this case is, as His Honor has already told you, is one involving capital felony murder. That's where we have charged the defendant with the taking of a human life during the perpetration or the commission of a robbery, and the penalty for that may be death, and the State, very candidly and very frankly, is going to ask this jury to return the death penalty in this case if they find this defendant guilty.

"Now, I know in this day and time many of us have discussed with other people, I have, I'm sure you probably have, our feelings on the death penalty. Some people believe that we should have it, that it is a proper punishment. Other people do not. There's nothing wrong, in my judgment at least, with believing either way. It's a matter of personal belief. Do you have a belief in this regard?

"MRS. CREAMER: No, I don't think so. I thought once I did, but I don't think so.

"MR. RAFF: Do you mind telling me, when you said you thought once you did, how did you?

"MRS. CREAMER: Well, if a person does something, I wouldn't want them to do it to me, if he's really guilty, I would just have to hear what is said, since I wouldn't know.

"MR. RAFF: I'm not talking about his guilt or innocence.

"MRS. CREAMER: You mean the death penalty.

"MR. RAFF: Let's just assume that you think, from the evidence as you hear it, and the law, that he's guilty. You are convinced beyond a reasonable doubt this man is guilty. The second question that is going to be posed to you, if he is guilty, what are we going to do with him. You see?

"MRS. CREAMER: Uh huh.

"MR. RAFF: Well, some people just are against the death penalty, and just not going to vote for the death penalty. They just are not going to do it, don't believe in it. Are you like that? There's nothing wrong with being that way.

"MRS. CREAMER: I don't know.

"MR. RAFF: You don't know? You don't know whether you could vote for it or not?

"MRS. CREAMER: If I thought the person was guilty, I could vote for it. I know that.

"MR. RAFF: Well, I'm saying that you have already made a determination in your mind from the evidence—

"MRS. CREAMER: If I thought if any person was guilty of a crime that deserved the death penalty, yes, I could vote for it.

"MR. RAFF: What about this kind of a crime, because that's what he's charged with, that is committing a robbery, and while you are committing that robbery, killing somebody. Do you think that is the kind of crime that ought to carry the death penalty?

"MRS. CREAMER: Yes, I do.

"MR. RAFF: You do?

"MRS. CREAMER: Yes, I do.

"MR. RAFF: And assume you heard the evidence, and we all realize that no one sitting on a jury can be an eyewitness, so you have to make up your mind with respect to whether he is guilty or whether he's not from what you hear out there in that court room, and the evidence and the testimony as you hear it, and let's assume when you hear it, and you weigh that evi-

dence to see what you believe and what you don't believe, and when you get through weighing it you come to the opinion that in your opinion beyond a reasonable doubt this man did that, he committed the robbery, and while he was doing it he killed somebody. Could you then, do you think that under that set of circumstances that that is the kind of crime that the death penalty should be given for?

"MRS. CREAMER: Yes, I do.

"MR. RAFF: Could you vote for it yourself?

"MRS. CREAMER: I guess. I believe I could. I was reading an article here the other day that I really could vote for, and I think I could. I don't know enough about this, I didn't read this. I don't know anything about it. I think I could.

"MR. RAFF: Well, let me explain something to you, Mrs. Creamer, and I know I seem to be belaboring this, and I don't mean to be, and I wanted you to have some measure of indulgence with me here, but it is most important that we must determine now whether you can or not. Let me explain to you why. This defendant is on trial for his life. Anyone on trial for their life should have their rights protected all the way, and I think all of us in this room would agree to that.

"MRS. CREAMER: Yes, sir.

"MR. RAFF: And certainly he has a right, if he's not guilty of this crime, certainly not to be given the death penalty, but for our system to really work it is not just enough that he has his rights, the people must have some rights, too. In other words, if the person goes on that jury and they can't vote for the death penalty when it is the right thing to do, they just can't do it, then the people in the State of Arkansas are not having their rights, are they?

"MRS. CREAMER: That's right.

"MR. RAFF: So the only person that can tell us whether you are a good juror, and the kind of person that should sit in this case, only you can tell us whether or not you could cast your vote and take the life of this defendant if he is guilty. Only you

can tell us that, and you must tell us, otherwise there won't be a fair trial in that courtroom, isn't that true?

"MRS. CREAMER: Yes. I couldn't do it.

"MR. RAFF: You could not do it?

"MRS. CREAMER: No.

"MR. RAFF: Then let me pose the question to you.

"THE COURT: Now, listen very carefully.

"MR. RAFF: Let me pose the question to you, and it is basically the same thing I have just asked you, and I appreciate your frankness and your honesty with the Court. I know the Court does and all lawyers, too, but we must ask it according to the Supreme Court in these words, so let me frame them to you, and your response should be a yes or no, okay?

"MRS. CREAMER: Yes.

"MR. RAFF: I take it from your answer and what you have told me that you would automatically vote against the imposition of the death penalty without regard to any evidence that might develop at the trial of this case.

"MRS. CREAMER: No. Say it again.

"MR. RAFF: Would you automatically vote against the imposition of the death penalty without regard to any evidence that might develop at the trial of this case?

"MRS. CREAMER: I know I'm confusing myself, but if the evidence were as such, I couldn't vote against it, but I just wouldn't want to vote for it. I couldn't vote against it.

"MR. RAFF: Didn't you tell—

"MRS. CREAMER: I wouldn't want to do it, but I couldn't vote—

"MR. RAFF: Let me ask you this, didn't you tell me—

"MRS. CREAMER: Yes, I did.

"MR. RAFF: —that you could not vote for the death penalty?

"MRS. CREAMER: I sure did, but then at the same time I could not say if any person was found guilty that I could set, if

they were guilty, I just wouldn't want to be the one.

"MR. RAFF: What we are talking about is, I said could you just not vote for the death penalty, and you said no, you could not. Your alternative here, you don't have to vote for the death penalty, even though he is guilty, you could vote for life imprisonment, you see. The jury has that choice.

"MRS. CREAMER: Oh.

"MR. RAFF: They have that choice. Now, what I'm trying to find out, even though you think he is guilty, would you automatically vote against the imposition of the death penalty without regard to any evidence that might develop in the trial of this case?

"MRS. CREAMER: I believe I would, yes, sir, because I don't want to take a life.

"MR. RAFF: Don't misunderstand me, there is nothing wrong with feeling that way, but we need to know, and only by people being honest and truthful with us, as you have been in your answers, will we find out. I think you are to be commended.

"THE COURT: Mrs. Creamer, I am going to excuse you for cause." [3]

Again, *Witt* controls our holding.

The law is stated in an opinion such as *Adams;* but the question in subsequent cases is whether a trial court finding that the standard was met is "fairly supported" by the "record ... considered as a whole...." The standard in this case is the easily understood one enunciated in *Adams;* whether the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 U.S., at 45 [100 S.Ct., at 2526]. Relevant *voir dire* questions addressed to this issue need not be framed exclusively in the language of the controlling appellate opinion; the opinion is, after all, an opinion and not an intricate devise in a will.

As we emphasized in *Marshall v. Lonberger,* 459 U.S. [422], at 432 [103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983)], the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record. Here we think there is ample support for the trial court's findings that [the juror's] views would have prevented or substantially impaired the performance of her duties as a juror. On four separate occasions she affirmed that her beliefs would interfere with her sitting as a juror. One common meaning of "interfere" is to "create an obstacle." Respondent argues that in [this juror's] case, the obstacle was not insurmountable; but the trial court found to the contrary. * * *

Thus, whatever ambiguity respondent may find in this record, we think that the trial court, aided as it undoubtedly was by its assessment of [the juror's] demeanor, was entitled to resolve it in favor of the State.

*Witt,* 469 U.S. at 433–34, 105 S.Ct. at 857. We hold that fair support exists in the record for the state court's determination that juror Creamer be excused for cause. It is true, as the district court reasoned, that the state prosecutor did not make specific inquiry concerning Mrs. Creamer's oath or her ability to follow, notwithstanding her convictions, the court's instructions. Yet there were sufficient questions propounded that the trial judge, who had the responsibility to serve as fact-finder and to pass on the credibility of the prospective jurors, had ample basis to determine that the juror's views would have prevented or substantially impaired her performance of her duties as a juror. It therefore follows that the state court's finding of bias as to this juror must be afforded the statutory presumption of correctness under § 2254(d). Accordingly, the judgment of the district court is reversed. This cause is remanded to that court for further proceedings consistent with this opinion. We are advised that Hulsey has asserted other grounds of attack against his sentence and conviction. The district court should now proceed to address these grounds.

**3.** Tr. of Voir Dire, Volume 3, pp. 365, 370–77.