**Emmitt FOSTER, Appellant,**

v.

**Paul DELO, Appellee.**

**No. 92–3557.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 24, 1994.

Decided Nov. 7, 1994.

Gino F. Battisti, St. Louis, MO (Robert T. Haar, on the brief), for appellant.

Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, MO, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, McMILLIAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges, En Banc.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Emmitt Foster was sentenced to death for the murder of Travis Walker. After his appeal failed, he filed a motion for post-conviction relief under former Missouri Rule 27.26. Mo.R.Crim.P. 27.26 (repealed and replaced with Mo.R.Crim.P. 29.15 in 1987). The Circuit Court of St. Louis County denied the motion, and the Missouri Court of Appeals affirmed the denial. *Foster v. State,* 748 S.W.2d 903 (Mo.App.1988). After exhausting his remedies in state court, Foster challenged the conviction and sentence by filing this petition for writ of habeas corpus alleging twenty-five constitutional defects in his trial. Since filing for relief in the district court, Foster has filed three state petitions for writ of habeas corpus, in 1988, 1992, and 1994, alleging grounds for relief that had not been raised in the earlier proceedings in state court. The district court considered Foster's petition on the state's motion for summary judgment and denied relief; Foster appealed. A panel of this court reversed and ordered the district court to issue a writ vacating the death sentence. *Foster v. Delo,* 11 F.3d 1451 (8th Cir.1994). We granted the state's request for rehearing, vacated the panel's opinion, and ordered rehearing en banc.

I.

Walker was murdered during the very early hours of November 20, 1983, after Foster and Michael Phillips entered, apparently on a ruse, the home Walker shared with Deann Keys, and robbed them of jewelry and other valuables. Phillips had telephoned Walker's home at approximately 2:00 a.m., claiming that he needed help with a flat tire. Walker and Phillips were friends and had known each other since childhood; Walker, Phillips, and Foster were teammates on a softball team. Keys also knew both Phillips and Foster, although she knew Foster as John Lee.

After the telephone call, Phillips arrived with Foster, and the two spoke with Walker; Keys remained in bed, but overheard parts of the conversation. Phillips soon entered the bedroom, pointed a gun at Keys, and ordered her into the living room. Keys went into the living room and saw Walker lying on the floor with Foster pointing a gun at his head. Foster and Phillips forced Keys to lie down next to Walker. Phillips began to search the victims' home for valuables and found some. He then demanded to know where the rest of the jewelry was. Walker told him that it was at Walker's mother's home. Phillips continued his search, but apparently found nothing more. He then told Keys and Walker that he and Foster were leaving and ordered the victims not to move or to attempt to pursue them. Keys heard a

shot and apparently lost consciousness. When she regained consciousness she tried to find a neighbor, but was unsuccessful; she then tried to use the telephone, but the line was dead. She returned to her bedroom, and, convinced that she was near death, wrote the names "John Lee" (Foster's alias) and "Mike Philips [sic]" twice on an envelope. Police officers, who had been summoned by Keys's neighbor, arrived and found Keys still alive; Walker was already dead. An autopsy subsequently revealed that Walker had been shot four times in the head. Medical evidence revealed that Keys had also been shot four times in the head. Walker and Keys were shot with different guns. Keys survived and testified at trial, identifying Foster as one of her assailants, although she could not say whether Foster or Phillips or both did the shooting.

Foster did not testify at either the guilt or penalty phase of his trial. He was convicted of capital murder and sentenced to death in 1984. Phillips remained a fugitive until shortly before Foster's trial and was tried in 1985. He was convicted of felony-murder and was sentenced to life in prison.

## II.

Of Foster's twenty-five grounds for relief, the panel found only one to be meritorious: it agreed that Foster's counsel had failed to inform him of his right to testify at the penalty phase of his trial and that this failure amounted to prejudicial ineffective assistance of counsel. The state argues that this claim and ten others are procedurally barred because Foster failed to raise them in his state petition for post-conviction relief. Although some of the ten claims are indeed barred, it is clear that Foster claimed that he was entitled to post-conviction relief in part because his trial counsel failed to call him to testify. This claim is therefore properly before us.

■ In order to be entitled to relief because of ineffective assistance of counsel, a petitioner must show both that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "An error by counsel even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Foster must also show that he was prejudiced by his counsel's ineffective performance: he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ Foster argues that his attorney should have called him to testify in order to convince the jury not to impose capital punishment on him. He does not, however, tell us why he believes that there is a reasonable probability that the jury would have reached a different verdict if it had heard his testimony. In fact, at the evidentiary hearing held when the state court heard his motion for relief under Rule 27.26, Foster never even indicated what his testimony would have been had he taken the stand. Since it is incumbent upon a petitioner to show that he was actually prejudiced by his counsel's actions, we cannot grant relief.

■ Foster admits in his brief that he failed to show prejudice at his hearing for post-conviction relief, but urges us to consider this as yet another example of ineffective assistance of counsel. The performance of Foster's post-conviction counsel, however, even if it were shown to have been ineffective, could not provide a basis for issuing a writ of habeas corpus. There is no constitutional right to counsel in state post-conviction hearings; there can be, therefore, no constitutionally ineffective assistance that could justify issuing the Great Writ on this ground. *Coleman v. Thompson*, 501 U.S. 722, 751–53, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); *Pollard v. Delo*, 28 F.3d 887, 888 (8th Cir. 1994).

## III.

■ When a panel of this court reviewed this case, it found in favor of the state

on twenty-four of Foster's claims. The state petitioned for rehearing of the one claim that it lost. Foster did not seek rehearing of the rejected claims, although his oral argument before this court made clear that he had not abandoned them. We will ordinarily consider on rehearing only those issues specifically raised in a petition; and will depart from this rule only on the rarest of occasions. *Brown v. Stites Concrete, Inc.*, 994 F.2d 553, 557 (8th Cir.1993) (en banc). Because Foster's petition for relief challenges the propriety of his execution, we believe that this case presents circumstances warranting a review of his remaining claims.

## A.

In addition to his claim that his counsel was ineffective for not calling him to testify, Foster argues that his counsel was ineffective for several other reasons.

■ Foster claims that his trial counsel was ineffective because he did not attempt to rehabilitate two members of the venire who stated on voir dire that they could not, in any circumstances, consider imposing capital punishment. Foster concedes, citing *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), that a prosecutor may exclude jurors who profess an inability to impose the death penalty. *See also Hulsey v. Sargent*, 865 F.2d 954 (8th Cir.1989), *cert. denied*, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 270 (1989). The prosecutor asked each of the jurors in question whether, after having been instructed as to the law and after hearing the evidence, they could not in any circumstances consider the death penalty. They answered, unequivocally, that they could not consider it. In the face of such clear answers, it was reasonable for Foster's trial counsel to conclude that there was no point in attempting to rehabilitate these two jurors.

■ Foster makes the related argument that trial counsel was ineffective for failing to object to the prosecutor's questioning of the venire with respect to capital punishment. In reviewing this argument as part of Foster's request for post-conviction relief, the Missouri Court of Appeals found that "[t]he prosecutor's questions were not a request for a commitment from prospective jurors to a future course of action, but constituted a proper inquiry into whether the venire members would be able to follow the court's instructions with regard to assessing punishment." *Foster, supra*, 748 S.W.2d at 907. The record adequately supports the findings of the state court, which are, of course, therefore entitled to a presumption of correctness. *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). The failure to object to proper questions cannot be considered unreasonable.

■ Foster asserts that his trial counsel was ineffective because he failed to make an offer of proof when, in the penalty phase, the court sustained the prosecutor's objections to several questions asked of Foster's mother in order to elicit mitigating evidence. The questions related to Foster's upbringing: his mother's age when he was born; whether his father was alive; whether he knew his father; whether he had deceased siblings; and whether his mother was wealthy. Foster's mother answered three of these before the prosecutor objected: she was fifteen when Foster was born; his father was deceased; not all of his siblings were still living. Even if we were to conclude that the failure to make an offer of proof with respect to the unanswered questions was unreasonable, we would still not be able to conclude that Foster's counsel was constitutionally ineffective because it is clear that Foster has not satisfied the requirements of *Strickland*. In order to be entitled to relief, Foster "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra*, 466 U.S. at 694, 104 S.Ct. at 2068. The Supreme Court explained that a reasonable probability "is a probability sufficient to undermine confidence in the outcome" of the trial. Foster has not demonstrated, and we cannot find anything in the record to suggest, that there was a reasonable probability that the jury would have chosen life imprisonment instead of execution if Foster's mother had been allowed to say that Foster never had much

contact with his father and that she was not a wealthy woman.

Foster's next claim is that his counsel was ineffective because he did not timely object to questions of a witness, one of Foster's neighbors who attended church with Foster, relating to a photograph that had not been disclosed to the defense prior to the trial, and to a reference to a tenet of the Islamic faith during the prosecutor's closing argument. The photograph apparently showed a man wearing a fez and sitting between an American flag and a Black Muslim flag. When the prosecutor asked whether the person in the photograph was Foster, Foster's counsel promptly objected; the record reveals no answer. The photograph was marked, but not admitted into evidence. The jury saw the photograph only at a distance. The prosecutor's only mention of Islam in his closing argument was in a reference to what he described as the Christians' "Golden Rule," namely, that one should do unto others what he would have others do unto him; he also stated that Muslims and Confucians have similar rules. We can find no evidence that counsel's action or inaction was ineffective or prejudicial.

■ Foster claims that his trial counsel was ineffective during the guilt phase of the trial because counsel failed to investigate the medical records of Deann Keys. According to the records of the emergency room to which Keys was brought, Keys was shot while lying in bed, not while lying on the floor in the living room. Since the only defense Foster presented was that he was not in Keys's home at the time of Walker's murder, and since Keys's testimony placed him in that place at that time, Foster argues that Keys's credibility was crucial to the government's case, and that the medical records, had they been introduced, would have impeached her credibility. Assuming, without deciding, that the medical records would have been admissible, Foster's argument has no merit. First, because Foster's defense was that he was not in Keys's home, it makes little difference whether she was shot in the bedroom or the living room. Second, the record reveals that Keys's speech was inaudible when police officers found her, and un-

derstandably so since she had been shot four times in the head. The personnel of the emergency room who made the record might well have made the error because they did not understand her. Third, Keys testified that she got up after she had been shot, left the apartment to find help, returned to the apartment when she thought she had failed, went to her bedroom, and wrote down the names of her assailants before lying down in the bed where she was eventually found. We cannot discern any prejudice in trial counsel's failure to show that this sequence of events began in the bedroom (assuming the medical records are correct and Keys's own recollection is wrong) rather than in the living room.

Foster's next argument is even less convincing: he argues that his trial counsel was ineffective for failing to offer into evidence the toxicological report on Walker's body. That report revealed that Walker's blood alcohol level was 0.117 percent. We fail to see how the failure to present evidence that Walker was drunk could possibly have been prejudicial to Foster in either of the phases of his trial.

■ Foster next asserts that his trial counsel was ineffective because he should have interviewed Phillips who was in custody one month before trial. In support of this argument, Foster has submitted Phillips's affidavit, executed in January of 1988, in which he states that had he been asked to testify at Foster's trial, he would have testified that to the best of his knowledge Foster had nothing to do with Walker's murder. We are not persuaded that it was unreasonable for trial counsel to decline to call Phillips to testify and thereby to subject him to cross-examination on the details of the crime and of Foster's role in it. We are also skeptical that Phillips would have testified at Foster's trial when he risked direct and cross-examination through which he might well have incriminated himself. We are confident, moreover, that the result of the trial would not have been different if Phillips had testified.

■ Foster claims that his trial counsel was ineffective for failing to investigate adequately the background of Tyrone Mitch-

ell, one of the state's witnesses. Mitchell testified that he heard and saw Keys on the night she was shot, that she had difficulty speaking, and that he directed a neighbor to telephone the police. Foster's trial counsel did not know that Mitchell had made a deal with the state according to which he would testify against Foster if the state dismissed a criminal charge against him. This claim is procedurally barred because Foster did not raise it in his direct appeal or in his state petition for post-conviction relief. Even if it were not barred, it would not provide a basis for relief. Mitchell was a minor witness and his testimony was consistent with that of others. We cannot say that if the jury had known about the agreement, it would have discounted Mitchell's testimony; if it had discounted Mitchell's testimony, it is not likely that it would have acquitted Foster.

■ Foster urges us to reverse the district court because his trial counsel was ineffective for failing to object to certain instructions given to the jury. Foster failed to raise these issues in his motion for post-conviction relief under Rule 27.26. He has therefore defaulted on these claims. His subsequent state petitions for writ of habeas corpus, which were filed after he filed his federal petition, cannot undo the default. *Blair v. Armontrout*, 976 F.2d 1130, 1136 (8th Cir. 1992), *cert. denied.* —— U.S. ——, 113 S.Ct. 2357, 124 L.Ed.2d 265 (1993); *Daniels v. Jones*, 944 F.2d 429 (8th Cir.1991).

### B.

■ Foster makes three arguments relating to the jury instructions given at the close of the penalty phase of Foster's trial. He argues, first, that the jury instructions required that the jury could consider as mitigating circumstances only those circumstances that the jury unanimously found to exist. Such instructions are contrary to the rule that the jury must be permitted to consider all mitigating evidence. *See Mills v. Maryland*, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988). Foster made this argument for the first time in his federal petition for a writ of habeas corpus. Because he raised this issue neither on direct appeal nor in his motion for relief under Rule

27.26, his claim for relief is barred. A petitioner may, of course, avoid a procedural bar if he can show both good cause for failing to raise the barred issue earlier and actual prejudice resulting from the alleged constitutional violation. *Wainwright v. Sykes*, 433 U.S. 72, 84–87, 97 S.Ct. 2497, 2505–07, 53 L.Ed.2d 594 (1977). But Foster has shown neither.

Foster's second challenge to the jury instructions concerns the third of four aggravating circumstances defined for the jury: the trial court instructed the jury to decide "[w]hether the murder of Travis Walker involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman." This instruction was based on former section 565.012.2(7). Mo. Ann.Stat. § 565.012.2(7) (Vernon 1979) (repealed and replaced with Mo.Ann.Stat. § 565.032.2(7) in 1983). Once again, Foster is not entitled to relief. Foster did not object at trial to the instruction he is now challenging; nor did he raise this issue in his state petition for post-conviction relief. His claim is therefore procedurally barred.

■ Foster's final challenge to the jury instructions is his claim that the trial court should have instructed the jury that it should consider as a mitigating circumstance whether Foster "acted under extreme duress or substantial domination of another person." Foster urges us to conclude that he was entitled to this instruction because he was acting under the substantial dominance of Phillips when they murdered Walker. The Supreme Court of Missouri found that Foster presented absolutely no evidence that he acted under duress or under Phillips's dominance on the night of the murder. *State v. Foster*, 700 S.W.2d 440, 444 (Mo.1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). That conclusion is well supported in the record, and thus Foster is not entitled to relief on this ground.

### C.

■ Foster's remaining claims relate to a number of alleged errors, some of which have already been discussed in other contexts. None has merit. Foster argues that the trial

court denied him a fair trial when it sustained the state's objections to questions that his counsel posed to his mother during the penalty phase of the trial. As we said above, the jury actually heard Foster's mother's answers to some of these questions before the state objected; Foster's trial counsel failed to make an offer of proof with respect to the unanswered questions. We held above that this could not be ineffective assistance of counsel because Foster could show no prejudice. In the present context, the determination of whether the trial court's ruling denied Foster a fair trial, we will consider Foster's claim procedurally barred unless the alleged constitutional error "probably resulted in a verdict of death against one whom the jury would otherwise have sentenced to life imprisonment." *Stokes v. Armontrout*, 893 F.2d 152, 156 (8th Cir.1989). Foster had wanted his mother to testify that he had little contact with his father and that one of his brothers was deceased. We do not think it probable that the more complete testimony of Foster's mother, which Foster presented at his hearing for state post-conviction relief, would have had any effect on the jury's verdict.

■ Foster argues that he was entitled to a trial by a jury drawn from a fair cross section of the community and that the state's exclusion of members of the venire who expressed reservations about capital punishment but did not unequivocally aver that they would not follow the court's instructions on the law with respect to the death penalty deprived him of a fairly representative jury. *See Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (a criminal defendant is entitled to trial by jury); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (petit jury must be selected from a pool that is a fair cross section of the community). The Supreme Court has made clear that it is not improper to exclude from a jury, either for cause or by way of peremptory challenges, those members of the venire who are opposed to capital punishment, and has emphasized that opponents of the death penalty are not members of a distinctive group that under *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), may not be excluded from the jury pool. *Lockhart v. McCree*, 476 U.S. 162, 173–74, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986). Foster's argument therefore provides no basis for relief.

■ Foster alleges that his rights under the Fourteenth Amendment were infringed by the refusal of the Missouri Supreme Court to accept an untimely request to transfer from the Missouri Court of Appeals to the Missouri Supreme Court his appeal of the denial of his state motion for post-conviction relief. The Missouri Court of Appeals had affirmed the denial of Foster's petition for post-conviction relief. Foster then requested rehearing by the Court of Appeals or transfer to the Missouri Supreme Court. The Court of Appeals denied his request. Foster next petitioned the Missouri Supreme Court requesting that it transfer his appeal from the Court of Appeals. The Missouri Supreme Court refused to file the request because it exceeded the six-page limit for such requests by one and one-half pages. Foster apparently shortened his request, but filed it two days late. Foster asserts that the Missouri Supreme Court routinely grants such requests for transfer and suggests that the failure to accept the untimely request was improper. Foster claims that this amounted to a deprivation of a fundamental constitutional right because the Missouri Supreme Court does not treat those who have been sentenced to death in the same manner as it treats others. He has, however, utterly failed to present evidence that the Supreme Court routinely grants such requests to other criminal defendants or other prisoners appealing from denials of post-conviction relief. Indeed, we have noted that the Missouri Supreme Court does not usually grant such requests. *Brown v. Armontrout*, 898 F.2d 84, 86 n. 5 (8th Cir.) (noting that the State argued in its brief that Missouri Supreme Court granted motion to transfer in only eleven percent of all cases in 1986; and noting that the district court in *Fisher v. Trickey*, 656 F.Supp. 797, 804 (W.D.Mo.1987), found no cases in which the Missouri Supreme Court granted a request for transfer made by a criminal defendant or a petitioner for writ of habeas corpus), *cert. denied*, 498 U.S. 868, 111 S.Ct. 186, 112 L.Ed.2d 149

(1990). We cannot conclude that the Missouri Supreme Court treated Foster differently from the way that it treated anybody else.

▪ Foster argues that his right to due process was infringed when the state played a tape recording of Dorothy Beck Lee's (Beck's) statements to police. Beck was Foster's girlfriend. She testified, as part of Foster's defense during the guilt phase of the trial, that Foster was with her at the time of the murder. She had told police that Foster was not with her at that time, and that Foster had asked her to cover for him by saying that she was with him then. The admissibility of evidence is a question of state law that does not raise a federal issue unless admitting the evidence infringes specific constitutional protections or is so prejudicial that it amounts to a denial of due process. *Adail v. Wyrick,* 711 F.2d 99, 102 (8th Cir.1983). Foster cites no specific protection that has been infringed; nor does he show us why the tape was so prejudicial that he was denied due process. Because there is no federal constitutional violation, we deny relief on this ground.

▪ Foster asserts that the state's argument at the close of the guilt phase of the trial violated due process. The state attempted to explain to the jury the differences between capital murder and first degree murder, and between those offenses and other homicides. The state argued that this was a case of capital murder, and explained that first degree murder is not a lesser included offense of capital murder: "That's the way the law used to be.... But now they changed the law as the legislature has the right to do.... Actually, they changed it again, but it doesn't go into effect until next year." At this point Foster's counsel objected. As Foster's argument here makes clear, this issue also is one of state law. Missouri does indeed forbid arguing questions of law to the jury. *State v. Williams,* 588 S.W.2d 70, 74 (Mo.App.1979). We can award a writ of habeas corpus on due process grounds, however, only if the state's argument so infected the trial as to render it fundamentally unfair. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144

(1986); *Pickens v. Lockhart,* 4 F.3d 1446, 1453 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1206, 127 L.Ed.2d 553 (1994). Having reviewed the record, we cannot conclude that the state's comments denied Foster due process.

▪ Foster claims that he should not be put to death because his punishment is disproportional to that imposed on Phillips and on other defendants in similar cases. The Eighth Amendment does not require that courts compare the sentences imposed in similar cases. *Pulley v. Harris,* 465 U.S. 37, 48–51, 104 S.Ct. 871, 878–79, 79 L.Ed.2d 29 (1984); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Under Missouri law, however, the Supreme Court of that state does undertake a comparative review of all verdicts in which a jury or a judge imposed capital punishment instead of imprisonment for life. Mo.Ann.Stat. § 565.014 (Vernon 1979) (repealed and replaced with Mo.Ann.Stat. § 565.035 in 1983). Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment of course entitles him to procedures to ensure that the right is not arbitrarily denied. *Wolff v. McDonald,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *see also Hicks v. Oklahoma,* 447 U.S. 343, 346–47, 100 S.Ct. 2227, 2229–30, 65 L.Ed.2d 175 (1980). But the Missouri Supreme Court conducted the relevant review in this case and concluded that the punishment was not disproportional to that imposed for similar crimes in similar cases. *Foster, supra,* 700 S.W.2d at 444–45. Foster's claim presents no basis for relief.

▪ Foster argues that he is entitled to relief because the state's failure to reveal that Tyrone Mitchell agreed to testify at Foster's trial in exchange for the state's dismissal of charges against Mitchell amounted to prosecutorial misconduct. This claim is procedurally barred because Foster failed to raise it in state proceedings. As we stated above, moreover, when we reviewed the claim of ineffective assistance of counsel relating to Mitchell's testimony, Mitchell was, despite Foster's assertions to the contrary, a minor witness. We do not think that there is

a reasonable possibility that the jury would have rendered a different verdict if the agreement between Mitchell and the state had been revealed to it.

## IV.

On May 13, 1994, eleven days before we heard argument en banc, Foster filed a motion to remand this matter to the district court for the presentation of newly discovered evidence. We took the motion as submitted with the case. Foster claims that an investigator working for the Missouri Capital Punishment Resource Center obtained in late 1993 a copy of the file on Travis Walker's murder held by the St. Louis police. She is said to have learned that a report by Sidney R. Anderson, an investigator with the Medical Examiner's office, stated that Deann Keys "was unable to talk due to damage from her wound, but from the evidence at the apartment, it appears that she was in bed when she was shot." This report, Foster claims, was never revealed to trial counsel. Foster has raised this issue in a separate petition for writ of habeas corpus that he filed on May 9 of this year with the Missouri Supreme Court. Because it is the subject of pending state proceedings, we deny Foster's motion without prejudice to such rights to raise this issue as he may have had as of May 13, 1994.

## V.

For the reasons given, we affirm the judgment of the District Court denying Foster a writ of habeas corpus.

BRIGHT, Senior Circuit Judge, with whom McMILLIAN, Circuit Judge, and JOHN R. GIBSON, Senior Circuit Judge, join, dissenting.

We dissent. Counsels' ineffective assistance deprived Foster of the right to testify on his own behalf and prejudiced the outcome of the sentencing proceeding. Thus, the death sentence is flawed.

## I. INCOMPETENCE OF COUNSEL

The majority has elected not to discuss the performance component of the *Strickland* inquiry and instead solely addresses the issue of prejudice. We, however, discuss both components of the ineffectiveness claim and observe that the deficiencies of counsels' actions throw light on the issue of prejudice, as well as establish that Foster received less than competent representation.

*Strickland* requires the petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). In his habeas petition, Foster contends that his counsels' failure to properly notify him of his fundamental right to testify during the penalty phase of his capital trial rendered counsels' conduct constitutionally deficient. The Report and Recommendation of United States Magistrate Judge, adopted by the federal district court,[1] rejected Foster's sixth amendment claim for failure to prove prejudice. In addition, the opinion asserted that the record did not support Foster's claims that he was misled by counsel or that he was ignorant of his right to testify. In this regard, the district court clearly erred as a matter of fact and erred as a matter of law based on the undisputed record.

We briefly relate the record on this matter. During the Rule 27.26 (now Rule 29.15) post-conviction hearing in the Circuit Court of St. Louis County, Peter Dunne, Foster's lead counsel at the penalty phase of his capital trial, in substance admitted not discussing with Foster whether or not Foster should take the stand during the penalty phase. On direct examination by Foster's counsel, Dunne said, "As I recall it, the subject came up principally about testifying in the guilt phase of the trial. I cannot pressume [sic] discussing his testifying in the penalty phase of the trial." Post–Conviction Relief Tr. [hereinafter PCR Tr.] Vol. I at 94.

---

1. The opinion in the district court relied substantially on the Missouri State Court of Appeals decision affirming the state circuit court's denial of Foster's post-conviction claim of ineffective assistance of counsel. *Foster v. State,* 748 S.W.2d 903 (Mo.Ct.App.1988).

During cross-examination by Foster's attorney, Dunne clarified that general response:

> Q Did you tell [Mr. Foster] he could testify in the penalty phase if he chose to do so?
>
> A I don't recall discussing the penalty of him testifying at the penalty phase.
>
> Q Didn't it occur to you that his testimony in the penalty phase would allow the jury to have more insight into the man Emmitt Foster was?
>
> A I guess the answer to that is, no.
>
> Q So you didn't think that could be helpful in terms of it leading to some mitigating evidence?
>
> A I don't see how it could have been.

PCR Tr. Vol. I at 130.

Similarly, when Foster's lead counsel during the guilt phase, Bill Aylward, was asked whether he had discussed with Emmitt Foster his ability to testify during the penalty phase, Mr. Aylward could not "recall specifically [whether] we did or not." PCR Tr. Vol. II at 12. When questioned whether Foster had at any time asked Aylward to allow him to testify, Aylward responded, "No." *Id.* at 13.

During this same hearing Emmitt Foster himself testified on this crucial issue as follows:

> Q Did they [Aylward and Dunne] explain to you that if the case were to go into the penalty phase that the jury would then be informed of your prior convictions?
>
> A No, they didn't.
>
> Q What did they tell you about the penalty phase?
>
> A Nothing in that respect.
>
> Q Did they inform you of whether or not you had the right to testify at that time?
>
> A No, they didn't.
>
> Q After the case was submitted to the jury and it returned its verdict did you at any time ask them if you could testify in the penalty phase?
>
> A No, I didn't have no knowledge that I could testify. So, you know, it never even entered my mind to try to testify I didn't believe I could.

PCR Tr. Vol. I at 41.

Thus, without dispute in the record, Foster's lawyers failed to appreciate the importance of having Foster testify during the penalty phase of his capital trial, to advise Foster of his constitutional right to testify in the penalty phase and to recognize the probable benefits deriving from such testimony. The federal district court's conclusion in this case, that there existed no indication that Foster was misled or ignorant of his right to testify, lacks any support in the record.[2]

The law recognizes the right of a criminal defendant to testify on his or her own behalf as fundamental and personal, with the privilege of waiver or invocation belonging solely to the defendant. *El–Tabech v. Hopkins,* 997 F.2d 386, 388 (8th Cir.1993); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987). A defendant's attorney, however, carries primary responsibility for notifying the defendant of that right. *United States v. Teague,* 953 F.2d 1525, 1533 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992). The very "purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Foster did not waive his right to testify at the penalty phase, but his attorneys ignored that right and rendered Foster grossly ineffective assistance in that regard. *Teague,* 953 F.2d at 1534; *cf. Bernloehr,* 833 F.2d at 752 n. 2 (noting that "cases in which courts have found a denial of a defendant's right to testify almost invariably involve ineffective assistance of counsel or impermissible actions by the trial judge").

---

2. As we have previously observed in the vacated panel opinion, counsels' rationale for advising Foster not to testify at the guilt phase as not beneficial to Foster disappeared at the penalty phase. The adoption of that rationale by the state and federal courts as to the penalty phase was faulty and clearly erroneous. *Foster v. Delo,* 11 F.3d 1451, 1456 (8th Cir.1993); *id.* at 1459–60 (Gibson, J., concurring).

## II. PREJUDICE

Counsels' failure to advise Foster of his right to testify during the penalty phase of his capital trial prevented the jury from considering vital mitigating evidence and thus prejudiced the proceeding.

To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel[s'] unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Beyond considerations of outcome, however, the *Strickland* inquiry asks whether the "result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993).

The majority contends that Foster's failure in the prior Missouri court proceedings to specify the content of his testimony constitutes a failure to establish prejudice and bars any relief. *See Foster,* maj. at 877. But that conclusion omits what is obvious in this case on the record before us. In our view, when counsel's conduct denies the defendant an opportunity to testify on his own behalf and that testimony might make the difference between life and death in the sentencing phase of the trial, a court must examine the whole record for a determination of prejudice or not.[3]

In this case, five defense witnesses testified during the penalty phase of the capital trial on Foster's behalf, four as character witnesses and one as an expert on the deterrent effect of capital punishment.

As the record reflects, three of the four character witnesses spoke about Foster's very active involvement in the African Methodist Episcopal (AME) Church to which he belonged. Albert A. Walton, Jr., a friend from church, suggested that Foster involved himself in the church "to reform himself and to live a better life." Trial Tr. Vol. III at

922. Another witness, Reverend Lawrence Davison, testified that Foster participated in various church projects, including the showing of films to children on Saturday afternoons. *Id.* at 909. A third witness, James Leonard "Mateus" Trimble, characterized Foster as a very close friend and a dedicated member of the church who frequently woke Trimble up on Sunday mornings to ensure that he went to services. *Id.* at 931–32.

The testimony elicited from these witnesses also sought to portray Foster as a responsible man whom people could count on and could trust with their children, their friends and their fellow parishioners. For instance, Reverend Davison testified that Foster had "keys to [his] church, to the door and to [his] upstairs apartment." *Id.* at 907. Mr. Trimble chronicled how Foster would always help Trimble move his junk collection in or out of the house. *Id.* at 934. And Mr. Walton stated that he "trusted [Emmitt Foster] at [his] home with [his] wife and children and friends." *Id.* at 922. The fourth witness, Foster's mother, attempted to present testimony on Foster's difficult upbringing, but the trial judge prevented the jury from hearing much about Foster's background by sustaining objections to several aspects of her testimony. *Id.* at 903–05.

As to the other side of the coin, how did the prosecutor portray Foster as a person deserving to die? The prosecutor dehumanized Foster as, in effect, a non-person, sometimes referring to him as "that," with comments such as these:

A friend, a friend for a few bucks, some pieces of jewelry. That's the manner of man they will have us believe we shouldn't do this. Let him go among the prison population, a prison population where every day other people are locked up for lesser crimes. Guards have to come to work unarmed. You have no right to do that with this man. I submit to you that

---

3. *Cf. Strickland,* 466 U.S. at 705, 104 S.Ct. at 2074.

[A] failure to consider relevant aspects of a defendant's character and background creates such an unacceptable risk that the death penalty was unconstitutionally imposed that, **even in cases where the matter was not raised below,** the "interests of justice" may impose on re-

viewing courts "a duty to remand [the] case for resentencing."

*Id.* (emphasis added) (Brennan, J., concurring in part and dissenting in part) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 117, n. *, 119, 102 S.Ct. 869, 878, n. *, 879, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring)).

that's what we mean by deterring him. They, too, the people who have to go to the penitentiary for other crimes which they have committed, have lesser but certain rights, and they have a right not to be exposed to that. And the guards, while they do an unbelieveably courageous job, have a right to some protection. They have a right to **that** (indicating) not being there, and that's what we call deterring him.

. . . .

... They [referring to the victim's family] had the right to have their son and grandson and brother for the rest of his natural life, until somebody superior to us deemed it time for him to die and not that (indicating).

. . . .

... It is right that he should be executed. There has been some religious discussion here. The Christians have the Golden Rule. 'Do unto others what you would have them do unto you.' Muslims reverse this process, and the Koran says, 'Do not do unto others what you would have him do unto you.' And Confucius says, 'Man should do that which is right, not for hope of reward or for fear of punishment. Man should do what is right, because that is what it means to be a man.' That is what is the essence of man, and that (indicating) is no man.

Trial Tr. Vol. III at 975–77 (emphasis added).

Does this court need a blueprint of knowing Foster's precise words which had never been spoken to address the issue of prejudice? On this record, the answer is "no."

The record, however, clearly denotes what Foster needed to do. He stood convicted of capital murder and faced a probable death sentence unless he could show that he deserved to live. His witnesses had spoken to elements of his good character. But without Foster's corroboration, that testimony gained no support from any affirmation by the person of whom the witnesses had spoken. Without such support of Foster's character,

the other witnesses' testimony lacked a point of reference, lacked substance and lacked credibility. Regardless of his actual words, just taking the stand after his witnesses had testified would demonstrate Foster as a human and not a "that."

We need go one step further. Is there prejudice shown? In this case, prejudice is apparent from the record. The prosecutor referred to defendant as a "that." Foster's mother was restricted in testifying on her son's behalf. Further, the evidence shows an equal probability that Foster may not have shot Walker, but that his colleague in the crime, Michael Phillips, may have killed Walker.[4] But the uncertainty of who shot Walker could carry no weight in the sentencing without Foster taking the witness stand.

We also know, although the jury did not, that this crime, albeit heinous, had not previously called for the death penalty, as Phillips had received life imprisonment. At least on the record in this case, no distinction exists between the conduct of Phillips and that of Foster. All of these circumstances lead to a logical conclusion of prejudice to Foster flowing from counsels' deficiency.

Finally, the prejudice from Foster not taking the stand comes across with striking effect in the argument of Foster's lawyer at the penalty phase:

MR. DUNNE: .... As I stand here before you in this court, I must confess to you that I am afraid. I am afraid for myself. I am afraid for Emmitt, that I don't have the ability to speak for him. That I won't be able to find the words that must be said now. And most of all, I am afraid that even if I did, you would not be swayed.

Trial Tr. Vol. III at 979.

What irony! The lawyer's ineffective argument was brought about by the lawyer's own ineffectiveness.

The Supreme Court has made clear the importance of a criminal defendant's right to testify, stating:

None of these modern innovations [in criminal procedure] lessens the need for

---

**4.** As ballistics disclosed, a separate gun provided the fatal gunshot wounds to Walker than the gun used to shoot and grievously wound Keys. *See* *Foster,* 11 F.3d at 1453. A 50% probability exists that Phillips shot Walker with his gun.

the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself [before the imposition of a sentence].

*Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). The Court has also observed "the most important witness for the defense in many criminal cases is the defendant himself." *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987).

Foster's failure to take the stand because of counsels' incompetence virtually guaranteed the death sentence under the circumstances. Absent counsels' incompetent waiver of Foster's right to testify, there exists a reasonable probability the jury would not have recommended the death penalty. *See Smith v. Murray*, 477 U.S. 527, 539, 106 S.Ct. 2661, 2669, 91 L.Ed.2d 434 (1986) (Stevens, J., dissenting) ("The record in this case unquestionably demonstrates that petitioner's constitutional claim is meritorious, and that there is a significant risk that he will be put to death *because* his constitutional rights were violated." (emphasis in original)).

No claim is made in this proceeding, nor could it cogently be made, that trial strategy entered into the failure of counsel to advise defendant of his right to testify at the penalty phase. *Cf. United States v. Norwood*, 798 F.2d 1094 (7th Cir.), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 711 (1986).

The majority today seizes upon the fact that there was no showing as to what Foster's testimony would have been. The critical point, however, is that Foster makes no argument that he had substantive factual testimony to give. What renders the result in this case fundamentally unfair or unreliable is that had Foster testified, his appearance and demeanor, coupled with the mitigating testimony offered on his behalf, could

well have caused jurors who entertained genuine doubts and who were troubled by an absence of absolute certainty[5] to vote against imposing the death penalty. It was Foster's only chance to escape the death penalty, but he was deprived of it to his prejudice by inadequate counsel.

## III. CONCLUSION

The failure of counsel to recognize the importance of Foster's testimony, and to advise him of his right to testify during the sentencing phase of the trial so that Foster could and would testify, skewed the adversarial balance in the State's favor, rendering the sentence of death unreliable and unfair. *Cf. Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069.

Accordingly, we would reverse the district court's order denying Foster's petition for habeas relief and direct the district court to issue a writ of habeas corpus vacating Foster's death sentence. We would leave to the State of Missouri the choice of having Foster resentenced to life imprisonment without the possibility of parole or seeking a new hearing on the penalty phase of this capital murder case.

---

**5.** Such absence of certainty has been referred to as whimsical doubt. *See Grigsby v. Mabry*, 758 F.2d 226, 247–48 (8th Cir.1985) (en banc) (Gibson, J., dissenting), *rev'd sub nom.*, *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Smith v. Balkcom*, 660 F.2d 573, 579–82 (5th Cir.1981), *modified on other*

grounds, 671 F.2d 858 (5th Cir.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *see also Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137 (1986); *Smith v. Wainright*, 741 F.2d 1248, 1255 (11th Cir.1984), *cert. denied*, 470 U.S. 1087, 1088, 105 S.Ct. 1853, 1855, 85 L.Ed.2d 150, 151 (1985).